**REED SMITH LLP**
Omar J. Alaniz (SBN 24040402)
Taylre C. Janak (SBN 24122751)
Haley B. Bray (SBN 24143584)
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
Telephone: (469) 680-4200
Facsimile: (469) 680-4299
E-mail: oalaniz@reedsmith.com
tjanak@reedsmith.com
hbray@reedsmith.com

*Attorneys for the*
*Debtors and Debtors-in-Possession*

**REED SMITH LLP**
Amalia Sax-Bolder (*admitted pro hac vice*)
1400 Wewatta St
Suite 350
Denver, CO 80202
Telephone: (303) 552-3800
Facsimile: (303) 552-3799
E-mail: asaxbolder@reedsmith.com

*Attorney for the*
*Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **GEV IO LLC, *et al.*,**[1] | § | **Case No. 26-31546 (MVL)** |
| | § | |
| **Debtors.** | § | **(Jointly Administered)** |

**DEBTORS' <u>EXPEDITED</u> MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE SALE OF THE DEBTORS' ASSETS TO THE SUCCESSFUL BIDDER FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (II) APPROVING CASTEL NETWORK PARTNERS, LLC AS STALKING HORSE BIDDER AND APPROVING BID PROTECTIONS, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS, AND (IV) GRANTING RELATED RELIEF**

**A HEARING DATE ON SUCH SALE IS SET FOR NOVEMBER 10, 2026 AT 1:30 P.M., WHICH IS AT LEAST 21 DAYS FROM THE DATE OF SERVICE HEREOF. NO OBJECTION TO SUCH SALE WILL BE CONSIDERED UNLESS A WRITTEN RESPONSE IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT 1100 COMMERCE**

[1] The Debtors in these Chapter 11 Cases and the last four digits of each of their federal tax identification numbers are: GEV IO LLC (9888) and Everywhere Internet, LLC (4237). The location of the Debtors' corporate headquarters and the Debtors' service address is 30665 U.S. Hwy 281 N. Bulverde, Texas 78163.

**STREET, DALLAS, TEXAS 75242 AT LEAST 4 DAYS IN ADVANCE OF SUCH HEARING DATE.**

**ANY RESPONSE SHALL BE IN WRITING AND FILED WITH THE CLERK, AND A COPY SHALL BE SERVED UPON COUNSEL FOR THE MOVING PARTY PRIOR TO THE DATE AND TIME SET FORTH HEREIN. IF A RESPONSE IS FILED A HEARING MAY BE HELD WITH NOTICE ONLY TO THE OBJECTING PARTY. IF NO HEARING ON SUCH NOTICE OR MOTION IS TIMELY REQUESTED, THE RELIEF REQUESTED SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT OR THE NOTICED ACTION MAY BE TAKEN.**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), by and through their undersigned counsel, respectfully represent as follows in support of this motion (the "**Motion**"):

## RELIEF REQUESTED

1. By this Motion,[2] the Debtors seek entry of an order, substantially in the form attached as **Exhibit A** (the "**Sale Order**"): (a) approving the sale (the "**Sale**") of the Purchased Assets (as defined in the applicable Purchase Agreement, and as described below), including the Debtors' wireless connectivity business operated under the "Nomad Internet" name, to Castel Network Partners, LLC, a Washington limited liability company ("**Castel**"), the bidder whose Bid was selected as the highest or otherwise best bid at the Auction (the "**Successful Bidder**"), pursuant to the bid selected at the Auction (the "**Successful Bid**") and the purchase agreement implementing the Successful Bid (the "**Purchase Agreement**"), which shall be that certain Asset Purchase Agreement dated as of September 29, 2026 and later amended as of October 20, 2026 (the "**Stalking Horse APA**"), between the Debtors and Castel, as further amended to reflect the

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Stalking Horse APA and the Bidding Procedures.

Successful Bid, free and clear of all Liens, claims, interests, and encumbrances (other than the Assumed Liabilities), pursuant to sections 105, 363, 365, 1123(a)(5), 1123(b)(4), 1141(c), and 1142(b) of the Bankruptcy Code; (b) authorizing and approving the assumption and assignment of the Assumed Contracts, including the Verizon Agreement, to the Successful Bidder pursuant to section 365 of the Bankruptcy Code, including approval of the schedule of Assumed Contracts and the Debtors' good-faith calculation of the related cure amounts attached hereto as **Exhibit B**; (c) approving Glenmont Resources, LLC as the Backup Bidder; (d) approving Castel as the Stalking Horse Bidder, the Stalking Horse APA, and the Bid Protections (as defined below) provided to Castel under the Stalking Horse APA; and (e) granting related relief.

## JURISDICTION AND VENUE

2. The United States Bankruptcy Court for the Northern District of Texas (the "**Court**") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The Debtors confirm their consent to entry of a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4. The bases for the relief requested herein are sections 105(a), 363, 365, 503(b), and 507(a)(2) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## BACKGROUND

5. On April 8, 2026 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief (the "**Chapter 11 Cases**") under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their businesses and manage their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases.

6. Pursuant to Rule 1015(b) of the Bankruptcy Rules and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Local Rules**"), the Court authorized the joint administration of the Chapter 11 Cases by entry of an order on April 15, 2026 [Dkt. No. 20].

7. The Debtors provide high-speed, secure wireless internet to rural communities and on-the-road travelers nationwide, providing remote internet coverage to customers in all 50 states. The Debtors' corporate headquarters is located at 30665 U.S. Hwy 281 N., Bulverde, Texas 78163.

8. A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' Chapter 11 Cases, is set forth in the *Declaration of Jessica Garza in Support of Chapter 11 Filings and First Day Relief* (the "**First Day Declaration**") filed with the Court on April 13, 2026 [Dkt. No. 15].

9. The Debtors retained GCP, Inc. ("**GCP**") as their investment banker pursuant to an engagement agreement dated May 28, 2026. GCP has extensive experience and a track record of success servicing telecommunication companies, and an excellent reputation in providing high-quality investment banking services to clients in financial restructurings and bankruptcy proceedings. The Court approved the retention application of GCP on July 22, 2026 [Dkt. No. 113].

10. On September 9, 2026, the Court entered an order appointing Erik White as chief restructuring officer (the "**CRO**") for the Debtors, effective as of July 9, 2026 [Dkt. No. 141] (the "**CRO Order**"). As set forth in the CRO Order, the CRO is authorized to, among other things, approve and authorize a sale of all or substantially all of the Debtors' assets or equity interests, whether pursuant to section 363 of the Bankruptcy Code or through a confirmed plan, subject to Bankruptcy Court approval and any applicable bidding procedures. The CRO also has authority to negotiate with prospective purchasers and other parties-in-interest, and to negotiate, propose, file, and seek confirmation of a plan of reorganization on behalf of the Debtors, subject to Bankruptcy Court approval.

**<u>THE MARKETING AND BIDDING PROCESS</u>**

11. On August 9, 2026, the Debtors filed the *Debtors' Expedited Motion for Entry of an Order (I) Approving Bidding Procedures in Connection with the Plan Sponsor Selection, (II) Authorizing Stalking Horse Selection, (III) Scheduling an Auction, and (IV) Granting Related Relief* [Dkt. No. 117] (the "**Bidding Procedures Motion**").

12. On September 9, 2026, the Court entered an *Order (I) Approving Bidding Procedures in Connection with the Plan Sponsor Selection, (II) Authorizing Stalking Horse Selection, (III) Scheduling an Auction, and (IV) Granting Related Relief* (the "**Bidding Procedures Order**") [Dkt. No. 139] and the bidding procedures attached thereto (the "**Bidding Procedures**").

13. The Bidding Procedures were designed to facilitate a comprehensive, competitive process to identify the highest or otherwise best bid for the Debtors' assets, with minimum barriers to entry and sufficient time for prospective bidders to perform due diligence. Among other things, the Bidding Procedures (a) required each bidder to deliver a binding, irrevocable bid accompanied

by a good faith deposit equal to ten percent (10%) of the consideration of the bid; (b) authorized the Debtors to select one or more stalking horse bidders and to provide market bid protections payable from the proceeds of a successful bid; and (c) established certain key dates for the sale process.

14. With the assistance of GCP, the Debtors received two stalking horse letters of indication. Following arm's-length negotiations, on September 29, 2026, the Debtors and Castel entered into the Stalking Horse APA. Consistent with the Bidding Procedures Order, the Debtors selected Castel as the stalking horse bidder (the "**Stalking Horse Bidder**") and, after receiving the good faith deposit from Castel, filed a notice in the Chapter 11 Cases designating Castel as the Stalking Horse Bidder on October 6, 2026 [Dkt. No. 153] (the "**Stalking Horse Notice**"). A true and correct copy of the Stalking Horse APA will be attached as **Exhibit 1** to the proposed Sale Order.

15. On October 14, 2026, Glenmont Resources, LLC ("**Glenmont Resources**") submitted a Qualified Bid to the Debtors in the amount of $1,000,000.

16. The Debtors conducted the Auction on October 19, 2026, with Castel and Glenmont Resources participating as Qualified Bidders. After six rounds of bidding, Castel was declared the Successful Bidder with a bid in the amount of $1,164,500, and Glenmont Resources was declared the Backup Bidder (the "**Backup Bidder**") with a bid in the amount of $1,240,000 (the "**Backup Bid**"). The Successful Bid materially exceeds the $850,000.00 Purchase Price under the Stalking Horse APA by 314,500. The Debtors will file and serve a Notice of Auction Results identifying the Successful Bidder and the Backup Bidder. Before the hearing on approval of the Sale, the Debtors will provide each Contract Counterparty (as defined below), subject to appropriate

confidentiality protections, information regarding the Successful Bidder's adequate assurance of future performance under the applicable Assumed Contract.

## OVERVIEW OF THE STALKING HORSE TRANSACTION

17. The following summarizes the material terms of the Stalking Horse APA[3]:

| Term | Summary |
|---|---|
| Sellers | GEV IO LLC d/b/a Nomad Internet and Everywhere Internet, LLC. (Preamble) |
| Stalking Horse Bidder | Castel Network Partners, LLC, a Washington limited liability company. (Preamble) |
| Purchase Price | $1,164,500 in cash, subject to the Subscriber Adjustment. (§ 3.1(a)) |
| Good Faith Deposit | Ten percent (10%) of the Purchase Price ($85,000.00), deposited with the Escrow Agent (Erik White, CRO), held in a segregated account in trust for Castel, credited against the Purchase Price at Closing, and returned to Castel if the Closing is not consummated or the Stalking Horse APA is terminated. (§ 3.1(b); § 1.1) |
| Subscriber Adjustment | If Active Paying Subscribers as of the Measurement Date are fewer than the Subscriber Floor of 3,800, the Purchase Price is reduced by $185.00 for each subscriber below the Subscriber Floor. (§ 3.3) |
| Purchased Assets | Substantially all assets used in the wireless connectivity business, including (a) equipment and the modem/CPE fleet; (b) the Verizon Agreement and associated Company IDs, billing profiles, SIM inventory, and ThingSpace access; (c) customer relationships, lists, data, and Customer Contracts; (d) intellectual property, including the "Nomad Internet" trade name, domain names, websites, software, and the operating platform; (e) Assigned Contracts; (f) transferable permits and licenses; (g) books and records; (h) accounts receivable attributable to the Purchased Assets; and (i) goodwill. (§ 2.1) |
| Excluded Assets | Cash, cash equivalents, bank accounts, and deposits; tax refunds and attributes; insurance policies; employee-related assets; all Estate Causes of Action, including Avoidance Actions; and all other assets not specifically included in the Purchased Assets. (§ 2.2) |

[3] This summary is provided for convenience only and is qualified in its entirety by the Stalking Horse APA. In the event of any inconsistency between this summary and the Stalking Horse APA, the Stalking Horse APA shall control.

| **Term** | **Summary** |
|---|---|
| Assumed Liabilities | Only liabilities under the Assumed Contracts that first arise and accrue from and after the Closing Date and do not relate to any pre-Closing breach or default. (§ 2.3) |
| Excluded Liabilities | All other liabilities of the Debtors, including administrative, priority, and unsecured claims; taxes; pre-Closing carrier invoices; litigation and refund claims; and insider obligations. (§ 2.4) |
| Assumed Contracts | Contracts listed on Schedule 2.1(e), including the Verizon Agreement, all Customer Contracts, and material SaaS and payment-processing agreements (including Chargebee, ShipStation, FreeScout, Zoho, Botpress, n8n, Twilio, and Slack). (§ 2.1(e)) |
| Key Closing Conditions | Among others: entry of the Sale Order that is not stayed; written consent of Verizon Wireless to assumption and assignment of the Verizon Agreement; Verizon confirmation of line count, rate plans, and Company IDs; execution of the Amended Verizon Agreement (term of not less than three years and a Transition Audit Period); transfer of SaaS/payment-processing agreements and the merchant-of-record without billing disruption; confirmation of the modem fleet; no Material Adverse Change; and execution of the Transition Services Agreement. (§§ 7.2(e), 7.6) |
| Bid Protections | If the Stalking Horse APA is terminated as a result of the Debtors' consummation of a competing transaction, Castel is entitled to (a) an Expense Reimbursement Amount not to exceed $60,000.00 and (b) a Break-Up Fee equal to 3% of the Purchase Price ($34,935.00), each constituting an administrative expense claim payable from the proceeds of the competing transaction upon its closing. (§ 9.3) |
| Fiduciary Out | Nothing in the Stalking Horse APA restricts the Debtors, consistent with their fiduciary obligations, from considering, negotiating, accepting, and consummating a competing transaction approved by the Court. (§ 6.5) |
| Backup Bidder | If designated as Backup Bidder, Castel remains obligated until the earlier of the closing of a sale to another party and the Outside Date. (§ 6.3) |
| Sale Order Milestone | Debtors to use commercially reasonable efforts to obtain entry of the Sale Order on or before November 10, 2026. (§ 6.1) |
| Closing | On or prior to five (5) Business Days after entry of the Sale Order, but in no event later than November 16, 2026. (§ 7.1) |

| **Term** | **Summary** |
|---|---|
| Outside Date | Either party may terminate if the Closing has not occurred within forty-five days following the date of the Stalking Horse APA (i.e., November 13, 2026). (§ 9.1(b)) |
| As-Is Sale | Purchased Assets are sold "as is, where is, and with all faults," without seller indemnification, other than the express representations in § 4.1. (§§ 5.1, 10.1) |
| No Successor Liability | Castel shall not be deemed a successor to, merged with, or a continuation of the Debtors. (§ 6.6) |
| Transfer Taxes | To the maximum extent provided by section 1146(a) of the Bankruptcy Code, the transfer shall not be subject to any transfer, stamp, or similar tax. (§ 7.4) |

18. The Stalking Horse APA contemplates that the Sale may be approved and consummated either pursuant to the Sale Order or the order confirming the Debtors' chapter 11 plan (the "**Plan**"), and, in either case, that the Purchased Assets will be transferred to the Successful Bidder free and clear of all Liens, claims, interests, and encumbrances (other than the Assumed Liabilities). The applicable Purchase Agreement and proposed Sale Order will provide that (a) the Successful Bidder is a good faith purchaser entitled to all protections available under applicable law, including protections analogous to those afforded by section 363(m) of the Bankruptcy Code; (b) the consideration provided by the Successful Bidder constitutes reasonably equivalent value and fair consideration; (c) the Assumed Contracts may be assumed and assigned to the Successful Bidder and the Successful Bidder has provided adequate assurance of future performance; (d) the Successful Bidder is not a successor to the Debtors; (e) notice of the Motion was properly provided to all Governmental Authorities with Tax jurisdiction over the Debtors or the Business; and (f) the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

19. Through this Motion, the Debtors respectfully submit that, in the exercise of their sound business judgment following a Court-approved marketing and bidding process, the Debtors

seek approval of the Successful Bid and Purchase Agreement reflecting the highest or otherwise best available offer for the Purchased Assets, which will be in the best interests of the Debtors' estates, creditors, and other parties in interest.

## BASIS FOR RELIEF

### A. The Auction Tested the Stalking Horse Bid and the Sale to the Successful Bidder Should Be Approved as a Sound Exercise of the Debtors' Business Judgment

20. The Court may authorize a debtor to sell property of the estate outside the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code. 11 U.S.C. § 363(b)(1). Section 363(b) provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Courts in the Fifth Circuit have approved a debtor's request to sell property of the estate outside of the ordinary course of business upon a finding that such sale is supported by sound business reasons. *See, e.g.*, *In re BNP Petroleum Corp.*, 642 F. App'x 429, 435 (5th Cir. 2016); *In re Cont'l Air Lines*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).

21. Once a debtor has articulated a valid business justification, "the business judgment rule . . . is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995); *see also In re*

*Friedman's, Inc.*, 336 B.R. 891, 895 (Bankr. S.D. Ga. 2005) (courts "should approve an exercise of a debtor's business judgment unless it is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, whim or caprice.") (quotation omitted).

22. In addition, the Court has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein because such relief is necessary for the Debtors to carry out their fiduciary duties under section 1107(a) of the Bankruptcy Code. Section 1107(a) "contains an implied duty of the debtor-in-possession" to "protect and preserve the estate, including an operating business' going-concern value," on behalf of the debtor's creditors and other parties in interest. *See In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (citations omitted). Under section 105(a), "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

23. The Sale process reflects the exercise of the Debtors' sound business judgment. The Debtors, with the assistance of GCP and under the direction of the CRO, conducted a Court-approved marketing process designed to elicit the highest or otherwise best offer for the Debtors' assets. The Stalking Horse APA is the product of that process and of arm's-length negotiations and established the floor for the Auction. The Auction provided Qualified Bidders an opportunity to improve upon the Stalking Horse Bid and, after six rounds of competitive bidding between Castel and Glenmont Resources, produced a Successful Bid that exceeds the Stalking Horse Bid, while preserving the value of the Business and the continuity of service to the Debtors' customers. Prompt consummation of the Sale to the Successful Bidder will maximize recoveries for the Debtors' estates.

24. The Purchase Price under the Successful Bid is fair and reasonable. Pursuant to the Stalking Horse APA, Castel initially agreed to pay $850,000.00 in cash for the Purchased Assets, subject to the Subscriber Adjustment, and Castel's obligations are not subject to any financing condition. The Auction conducted on October 19, 2026 tested the Stalking Horse Bid against the competing Qualified Bid of Glenmont Resources, and, after six rounds of bidding, the Debtors selected Castel's bid of $1,164,500.00 as the Successful Bid based on the totality of the circumstances. The Debtors seek approval of the Successful Bid and Purchase Agreement as representing the highest or otherwise best value reasonably obtainable for the Purchased Assets and constituting reasonably equivalent value and fair consideration.

25. Any delay in consummating the Sale could jeopardize the Stalking Horse APA and the value of the Business, to the detriment of the Debtors' estates and stakeholders. The Stalking Horse APA provides that the Debtors shall use commercially reasonable efforts to obtain entry of the Sale Order on or before November 10, 2026, and that the Closing shall occur no later than November 16, 2026. Accordingly, the Debtors submit that it is appropriate for the Court to consider this Motion at a hearing on or before November 10, 2026 and to authorize the Sale to the Successful Bidder pursuant to the Successful Bid and Purchase Agreement.

## B. The Court Should Approve Castel Network Partners, LLC as Stalking Horse Bidder and the APA as the Stalking Horse APA

26. Consistent with the Bidding Procedures Order [Dkt. No. 139], which authorized the Debtors to select one or more Stalking Horse Bidders and file a Stalking Horse Notice, the Debtors, after receiving stalking horse indications of interest and engaging in arm's-length negotiations, selected Castel Network Partners, LLC as the Stalking Horse Bidder and entered into the Stalking Horse APA dated September 29, 2026. The Debtors filed the Stalking Horse Notice identifying Castel and attaching the Stalking Horse APA.

27. Castel's Stalking Horse Bid established a floor for the value of the Purchased Assets and promoted competitive bidding by providing a baseline against which Qualified Bids were evaluated at the Auction, resulting in a Successful Bid that exceeds the Stalking Horse Bid. The Debtors therefore request that the Court approve Castel's designation as the Stalking Horse Bidder and approve the Stalking Horse APA, as amended to reflect the Successful Bid, and authorize the Debtors to consummate the Sale with the Successful Bidder pursuant to the Successful Bid and Purchase Agreement approved by the Court.

28. The Debtors further request that the Court approve Glenmont Resources as the Backup Bidder and the Backup Bid. In accordance with the Bidding Procedures, if the Sale to the Successful Bidder fails to close, the Debtors request authority to consummate the Sale with the Backup Bidder pursuant to the Backup Bid without further order of the Court.

**C. The Bid Protections Should Be Approved**

29. The APA provides Castel, as the Stalking Horse Bidder, with a Break-Up Fee equal to 3% of the Purchase Price ($34,935.00) and an Expense Reimbursement Amount not to exceed $60,000.00 (collectively, the "**Bid Protections**"), pursuant to Section 9.3 of the Stalking Horse APA. The Bid Protections are payable only if the Stalking Horse APA is terminated as a result of the Debtors' consummation of a competing transaction, and then only upon consummation of that competing transaction, and from the proceeds of such competing transaction. The Bidding Procedures Order and Bidding Procedures authorized the Debtors to provide a stalking horse bidder with market bid protections payable from the proceeds of a Successful Bid to the extent the Debtors determine such protections would be an actual and necessary cost of preserving the value of the Debtors' estates.

30. The Bid Protections were a material inducement for Castel to enter into the Stalking Horse APA and serve as the Stalking Horse Bidder, thereby establishing a floor for the Debtors' assets and promoting competitive bidding. Because Castel was selected as the Successful Bidder at the Auction, the Debtors do not anticipate that the Bid Protections will become payable. In any event, because the Bid Protections are payable only upon consummation of a higher or otherwise better competing transaction, and solely from that transaction's proceeds, they impose no cost on the estates unless the estates realize greater value. The Debtors therefore request that the Court approve Castel as the Stalking Horse Bidder, the Stalking Horse APA, and, to the extent they become payable, the Bid Protections as actual and necessary costs of preserving the estates entitled to allowance as administrative expenses under sections 503(b) and 507(a)(2) of the Bankruptcy Code.

**D. The Sale Should Be Approved Free and Clear of All Liens, Claims, Interests, and Encumbrances**

31. Section 363(f) of the Bankruptcy Code permits a debtor to sell property of the estate free and clear of liens, claims, encumbrances, and interests if any one of the five conditions set forth in section 363(f)(1)–(5) is satisfied, as section 363(f) is written in the disjunctive. *See In re Nature Leisure Times, LLC*, No. 06-41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007) ("The language of § 363(f) is in the disjunctive such that a sale free and clear of an interest can be approved if any one of the aforementioned conditions contained in § 363(f) are satisfied.").

32. The Debtors submit that they will be able to demonstrate, with respect to each holder of a lien, claim, encumbrance, or interest in the Purchased Assets, that one or more of the standards set forth in section 363(f) has been satisfied, including that such holder has consented, or is deemed to have consented, to the Sale, or could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. Any such liens, claims, encumbrances, and interests

shall attach to the proceeds of the Sale with the same validity, priority, and effect as they had against the Purchased Assets immediately prior to the Sale.

33. Further, neither the Successful Bidder nor any of its affiliates is a successor to the Debtors or their estates by reason of any theory of law or equity, and the Successful Bidder will not assume, or be responsible for, any liability or obligation of the Debtors or their estates other than the Assumed Liabilities. The Debtors therefore request that the Court find that the Successful Bidder's acquisition of the Purchased Assets shall be free and clear of any successor liability claims, including any liability for Taxes and any liability under any bulk-sales, bulk-transfer, or successor-liability law, and that all Persons be permanently enjoined from asserting against the Successful Bidder, its successors, or the Purchased Assets any claims, interests, or encumbrances that arose prior to the Closing (other than the Assumed Liabilities).

**E. The Successful Bidder Is a Good Faith Purchaser Entitled to the Protections of Section 363(m)**

34. The Successful Bidder was selected pursuant to the Court-approved Bidding Procedures following a competitive Auction, and the Successful Bid and Purchase Agreement were negotiated and will be executed at arm's length and in good faith, without collusion or fraud of any kind. The Successful Bidder will be required to represent that neither it nor any of its affiliates or representatives has engaged in any collusion with respect to the bidding process or the sale of any of the Purchased Assets. The Debtors are not aware of any pre-existing relationship between the Successful Bidder and the Debtors or their insiders. *See* 11 U.S.C. § 363(m); *see also Bleaufontaine, Inc. v. Roland Int'l (In re Bleaufontaine, Inc.)*, 634 F.2d 1383, 1388 n.7 (5th Cir. 1981) (a lack of good faith in a bankruptcy sale requires a showing of fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders). Accordingly, the Debtors request that the Court find that, upon submission of relevant evidence at

the Sale Hearing, the Successful Bidder (and, if applicable, the Backup Bidder) is a good faith purchaser entitled to the full protections of section 363(m) of the Bankruptcy Code and, to the extent the Sale is consummated through the Plan, all analogous protections available under applicable law.

**F. The Assumption and Assignment of the Assumed Contracts Should Be Approved**

35. Section 365(a) of the Bankruptcy Code provides that a debtor in possession, subject to the Court's approval, may assume and assign any executory contract or unexpired lease of the debtor. 11 U.S.C. § 365(a). A debtor's determination to assume and assign an executory contract is subject only to the business judgment standard and will not be disturbed absent a showing that the decision was clearly an unreasonable exercise of such judgment. *See Richmond Leasing Co. v. Cap. Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985); *COR Route 5 Co. v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 383 (2d Cir. 2008). The assumption and assignment of the Assumed Contracts—most importantly, the Verizon Agreement, through which the Debtors provide service to their subscribers—is a necessary and integral part of the Sale and reflects the Debtors' sound business judgment.

36. Section 365(f)(1) of the Bankruptcy Code provides that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease." 11 U.S.C. § 365(f)(1). The Debtors request that the Assumed Contracts be assumed and assigned to the Successful Bidder notwithstanding any such provision, to the maximum extent permitted by applicable law. Because Castel was selected as the Successful Bidder, the Closing is conditioned on Verizon Wireless's written consent to the assumption and assignment of the Verizon Agreement and on the execution of the Amended Verizon Agreement between Castel and Verizon Wireless. The Debtors will continue to facilitate discussions between

Castel and Verizon Wireless, and, if necessary, between the Backup Bidder and Verizon Wireless, regarding the assumption and assignment of the Verizon Agreement.

37. Pursuant to section 365(b)(1) of the Bankruptcy Code, all monetary defaults under the Assumed Contracts must be cured, or adequate assurance of prompt cure must be provided, as a condition to assumption. The Debtors' good-faith calculation of the cure amounts associated with each Assumed Contract (the "**Cure Costs**") is set forth on the schedule attached hereto as **Exhibit B** (the "**Cure Schedule**"). Because pre-Closing liabilities are Excluded Liabilities under the Stalking Horse APA, the Cure Costs shall be paid by the Debtors at or prior to Closing. Notice of this Motion, together with the Cure Schedule, will be served on each non-Debtor counterparty to an Assumed Contract (each, a "**Contract Counterparty**"). Any Contract Counterparty wishing to object to its proposed Cure Cost, or to the proposed assumption and assignment of its Assumed Contract, must timely file and serve an objection to this Motion.

38. In addition, pursuant to section 365(f)(2)(B) of the Bankruptcy Code, a debtor may assign an executory contract if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2)(B). Under the Bidding Procedures, each Qualified Bidder is required to demonstrate that it has, or will have at Closing, sufficient funds to pay the purchase price and consummate the transaction, and that it is capable of providing adequate assurance of future performance sufficient to satisfy section 365 of the Bankruptcy Code with respect to the Assumed Contracts. Castel's obligations under the Stalking Horse APA are not subject to any financing condition. Before the Sale hearing, the Debtors will provide each Contract Counterparty, subject to appropriate confidentiality protections, information regarding the Successful Bidder's adequate assurance of future performance. Accordingly, the Debtors submit that the Successful Bidder's obligations under the Purchase Agreement to perform the Debtors'

obligations under the Assumed Contracts from and after the Closing will constitute adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

**G.**

**WAIVER OF BANKRUPTCY RULES 6004(a), 6004(h), and 6006(d)**

39. The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude the Sale Order from (a) the fourteen-day stay period under Bankruptcy Rule 6004(h) applicable to orders authorizing the use, sale, or lease of property, and (b) the fourteen-day stay period under Bankruptcy Rule 6006(d) applicable to orders authorizing the assignment of an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code, such that the Sale Order shall be immediately effective and enforceable upon its entry.

**APPLICATION OF SALE PROCEEDS**

40. The net proceeds of the Sale (after payment of amounts required to be paid at Closing pursuant to the Purchase Agreement) shall be retained by the Debtors' estates and distributed in accordance with the Plan or further order of this Court. Nothing in this Motion or the Sale Order shall be deemed to authorize any distribution of Sale proceeds to any creditor or interest holder except as set forth herein or as otherwise ordered by the Court.

**RESERVATION OF RIGHTS**

41. Nothing contained herein is intended to be or shall be deemed as (i) an implication or admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy

Code or any other applicable nonbankruptcy law, (iv) a waiver of the obligation of any party in interest to file a proof of claim, (v) an agreement or obligation to pay any claims, (vi) a waiver of any claims or causes of action which may exist against any creditor or interest holder, or (vii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

## NOTICE

42. Notice of this Motion and the Cure Schedule will be provided to: (a) all parties in interest listed on the master service list maintained by the Debtors; (b) the Office of the United States Trustee for the Northern District of Texas; (c) Castel, as the Stalking Horse Bidder and Successful Bidder, and its counsel; (d) Glenmont Resources, as the Backup Bidder, and its counsel; (e) all Contract Counterparties, including Cellco Partnership d/b/a Verizon Wireless; (f) all known holders of liens, claims, encumbrances, or interests in the Purchased Assets; (g) all Governmental Authorities with Tax jurisdiction over the Debtors or the Business, including the Internal Revenue Service; and (h) all persons and entities entitled to notice pursuant to Bankruptcy Rule 2002. The Debtors respectfully submit that no further notice is required under the circumstances.

WHEREFORE, the Debtors respectfully request entry of the Sale Order (i) approving the Sale of the Purchased Assets to the Successful Bidder pursuant to the Successful Bid and Purchase Agreement; (ii) authorizing the Sale free and clear of all Liens, claims, interests, and encumbrances (other than the Assumed Liabilities); (iii) approving Glenmont Resources as the Backup Bidder and the Backup Bid; (iv) approving Castel as the Stalking Horse Bidder and the Stalking Horse

APA; (v) authorizing and approving the assumption and assignment of the Assumed Contracts to the Successful Bidder; (vi) approving the Bid Protections provided to Castel under Section 9.3 of the Stalking Horse APA, including the Break-Up Fee of 3% of the Purchase Price ($34,935.00) and Expense Reimbursement Amount of up to $60,000.00, payable only upon consummation of a competing transaction from the proceeds of that transaction and allowable as administrative expenses under sections 503(b) and 507(a)(2) of the Bankruptcy Code; and (vii) granting such other and further relief as the Court may deem just and appropriate.

Dated: October 20, 2026
Dallas, Texas

Respectfully submitted,

**REED SMITH LLP**

/s/ *Omar J. Alaniz*
Omar J. Alaniz (SBN 24040402)
Taylre C. Janak (SBN 24122751)
Haley B. Bray (SBN 24143584)
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
Telephone: (469) 680-4200
Facsimile: (469) 680-4299
E-mail: oalaniz@reedsmith.com
tjanak@reedsmith.com
hbray@reedsmith.com

-and-

Amalia Sax-Bolder (*admitted pro hac vice*)
1900 Lawrence St, Suite 2800
Denver, CO 80202
Telephone: (303) 552-3800
Facsimile: (303) 552-3799
E-mail: asaxbolder@reedsmith.com

*Counsel for the Debtors and Debtors-in-Possession*

**CERTIFICATE OF SERVICE**

The Debtors will file a certificate of service after mailing is complete.

/s/ *Taylre C. Janak*
*Taylre C. Janak*