# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| **GEV IO LLC, *et al.*,** | § | **Case No. 26-31546 (MVL)** |
| **Debtors.**[1] | § | **(Jointly Administered)** |

**ORDER (I) APPROVING THE SALE OF THE DEBTORS' ASSETS TO THE SUCCESSFUL BIDDER FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (II) APPROVING CASTEL OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (II) APPROVING CASTEL NETWORK PARTNERS, LLC AS STALKING HORSE BIDDER AND APPROVING BID PROTECTIONS, (III) APPROVING GLENMONT RESOURCES, LLC AS BACKUP BIDDER, (IV) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS, AND (V) GRANTING RELATED RELIEF**

Upon the motion, dated October 20, 2026 (the "**Motion**"),[2] of GEV IO LLC and Everywhere Internet, LLC, as debtors and debtors in possession in the above-captioned chapter 11

[1] The Debtors in these Chapter 11 Cases and the last four digits of each of their federal identification numbers are GEV IO LLC (9888) and Everywhere Internet, LLC (4237). The location of the Debtors' corporate headquarters and the Debtors' service address is 30665 U.S. Hwy 281 N. Bulverde, Texas 78163.
[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, the Stalking Horse APA, or the Purchase Agreement, as applicable.

cases (collectively, the "**Debtors**"), for entry of an order pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), (i) approving the sale (the "**Sale**") of the Purchased Assets, including the Debtors' wireless connectivity business operated under the "Nomad Internet" name, equipment and the modem/CPE fleet, the Verizon Agreement and associated Company IDs, billing profiles, SIM inventory, and ThingSpace access, customer relationships, lists, data, and Customer Contracts, intellectual property including the "Nomad Internet" trade name, domain names, websites, software, and operating platform, Assumed Contracts, transferable permits and licenses, books and records, accounts receivable attributable to the Purchased Assets, and goodwill, to Castel Network Partners, LLC, a Washington limited liability company ("**Castel**"), the Successful Bidder selected at the Auction, pursuant to the bid selected at the Auction (the "**Successful Bid**") and the purchase agreement implementing the Successful Bid (the "**Purchase Agreement**"), which shall be that certain Asset Purchase Agreement dated as of September 29, 2026, amended as of October 20, 2026, between the Debtors and Castel (the "**Stalking Horse APA**"), as further amended to reflect the Successful Bid and attached hereto as **Exhibit 1**, free and clear of all Liens, claims, interests, and encumbrances other than the Assumed Liabilities, and excluding cash, cash equivalents, bank accounts and deposits, tax refunds and attributes, insurance policies, employee-related assets, all Estate Causes of Action including Avoidance Actions, and all other assets not specifically included in the Purchased Assets; the Stalking Horse APA providing for a stalking horse purchase price of $1,164,500 in cash, subject to the Subscriber Adjustment, and a good-faith deposit equal to 10% of the purchase price held by Erik White, CRO, as escrow agent (the "**Escrow Agent**"), credited against the purchase price at Closing or returned if the Closing is not consummated; (ii) authorizing

and approving the assumption and assignment of the Assumed Contracts, including the Verizon Agreement, to the Successful Bidder pursuant to section 365 of the Bankruptcy Code, with Cure Costs to be paid by the Debtors at or before Closing; (iii) approving Castel as the Stalking Horse Bidder, the Stalking Horse APA, and the Bid Protections provided to Castel under section 9.3 of the Stalking Horse APA; (iv) approving Glenmont Resources, LLC ("**Glenmont Resources**") as the Backup Bidder and authorizing the Debtors to consummate the Sale with Glenmont Resources without further order if the Sale to Castel fails to close; and (v) granting related relief, all as more fully set forth in the Motion; and the Debtors having filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on April 8, 2026 (the "**Petition Date**"); and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion, the Auction, the Sale Hearing, the Purchase Agreement, the Assumed Contracts, and the Cure Costs having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion, the First Day Declaration of Jessica Garza filed on April 13, 2026 [Dkt. No. 15], the Bidding Procedures Motion filed on August 9, 2026 [Dkt. No. 117], the *Bidding Procedures* Order entered on September 9*,* 2026 [Dkt. No. 139], the Stalking Horse Notice filed on October 6*,* 2026 [Dkt. No. 153], *and* the Notice of Auction Results [Dkt. No. [▪]]; *and* this Court having entered an order authorizing *the* joint administration *of the* Chapter 11 Cases on April 15, 2026 [Dkt. No. 20]; and this Court having approved the retention *of* GCP, Inc. as the Debtors' investment banker on July 22, 2026 [Dkt. No. 113]; and this Court having entered an order appointing Erik White as the Debtors' chief

restructuring officer on September 9, 2026 [Dkt. No. 141]; and the Debtors having conducted the Auction on October 19, 2026 after six rounds of bidding, with Castel declared the Successful Bidder with a bid of $1,164,500 and Glenmont Resources declared the Backup Bidder with a bid of $1,240,000; and this Court having conducted a hearing on November 10, 2026 (the "**Sale Hearing**") to consider the relief requested in the Motion as set forth in this Order; and all parties in interest having been heard or having had the opportunity to be heard regarding the Motion, the Sale, the Purchase Agreement, the Stalking Horse APA, the Assumed Contracts, and all relief set forth herein; and all objections, if any, to the Motion, the Sale, the Purchase Agreement, and the assumption and assignment of the Assumed Contracts having been withdrawn, resolved, or overruled; and upon the record of the Sale Hearing and all of the proceedings had before this Court; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors and their respective estates and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY FOUND AND DETERMINED THAT:**

A. **Fed. R. Bankr. P. 7052.** The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. This Court's findings shall also include any oral findings of fact and conclusions of law made by this Court during or at the conclusion of the Sale Hearing.

B. **Jurisdiction and Venue.** This Court has jurisdiction to consider the Motion, the Sale, the Purchase Agreement, and the assumption and assignment of the Assumed Contracts pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b), and this Court has authority to enter a final order. Venue of these chapter 11 cases and this matter is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C. **Statutory Predicates.** The statutory predicates for the relief granted herein are sections 105(a), 363, 365, 503(b), and 507(a)(2) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and the applicable Bankruptcy Local Rules for the United States Bankruptcy Court for the Northern District of Texas.

D. **Final Order; Incorporation by Reference.** This Order is a final order within the meaning of 28 U.S.C. § 158(a). The findings of fact and conclusions of law contained in the Bidding Procedures Order are incorporated herein by reference to the extent applicable to the Sale, the Purchase Agreement, the Assumed Contracts, and the relief granted herein.

E. **Notice and Opportunity to Object.** As evidenced by the affidavits of service filed on [▪] and [▪][3] [Dkt. Nos. [▪]], due, proper, timely, adequate, and sufficient notice and a reasonable opportunity to object or be heard with respect to the Motion, the Auction, the Sale Hearing, the Purchase Agreement, the Assumed Contracts, the Cure Costs, and the relief granted herein were provided to (a) the Office of the United States Trustee for the Northern District of Texas, (b) Castel and its counsel, (c) Glenmont Resources and its counsel, (d) all Contract Counterparties, including Cellco Partnership d/b/a Verizon Wireless, (e) all persons and entities known by the Debtors to have expressed an interest in acquiring the Debtors' business or assets, (f) all known holders of Liens, claims, interests, or encumbrances in the Purchased Assets, (g) all

[3]Certain docket numbers and the Sale Hearing date remain placeholders to be completed before entry of the Sale Order.

federal, state, and local regulatory or taxing authorities and recording offices with a reasonably known interest in the relief granted herein, including the Internal Revenue Service, (h) all parties entitled to notice under Bankruptcy Rule 2002 and the applicable Bankruptcy Local Rules, and (i) all other parties entitled to notice under the Bidding Procedures Order. Such notice was adequate and appropriate under the circumstances, and no other or further notice need be provided.

F. **Property of the Estates.** The Purchased Assets are property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code, and the Debtors have all title, interest, and rights necessary to transfer and convey the Purchased Assets to the Successful Bidder in accordance with the Purchase Agreement and this Order.

G. **Marketing Process and Auction.** The Debtors, with the assistance of GCP, Inc. and under the direction of Erik White, adequately marketed the Purchased Assets in accordance with the Bidding Procedures Order and the Bidding Procedures. The marketing and sale process was non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for prospective bidders to submit a higher or otherwise better offer. The Auction was held on October 19, 2026, and after six rounds of bidding Castel was determined to have submitted the highest or otherwise best bid.

H. **Bidding Procedures.** The Bidding Procedures approved by the Bidding Procedures Order were substantively and procedurally fair to all parties and potential bidders and afforded a full, fair, and reasonable opportunity to submit a higher or otherwise better bid. The Debtors conducted the marketing and sale process without collusion and in accordance with the Bidding Procedures and the Bidding Procedures Order.

I. **Successful Bidder and Backup Bidder.** On October 14, 2026, Glenmont Resources submitted a Qualified Bid to the Debtors in the amount of $1,000,000. After the

Auction, Castel was declared the Successful Bidder with the Successful Bid of $1,164,500, and Glenmont Resources was declared the Backup Bidder with a Backup Bid of $1,240,000. The Successful Bid and the Backup Bid were determined in accordance with the Bidding Procedures and represent the highest or otherwise best available bids for the Purchased Assets. The Notice of Auction Results will identify the Successful Bidder and Backup Bidder and the applicable bids.

J. **Corporate Authority.** The Debtors have full corporate power and authority to execute and perform the Purchase Agreement and the other documents contemplated thereby, have all power and authority necessary to consummate the Sale, and have taken all corporate action necessary to authorize and approve the Purchase Agreement and the transactions contemplated thereby, subject only to the closing conditions expressly provided in the Purchase Agreement and this Order.

K. **Business Justification; Fiduciary Duties.** The Debtors' entry into and consummation of the Purchase Agreement and the Sale constitute a sound exercise of the Debtors' business judgment and are in the best interests of the Debtors, their estates, their creditors, and all parties in interest. The Debtors have articulated good and sufficient business reasons for the Sale, including the need to preserve and maximize the value of the Nomad Internet business and provide continuity of service to customers.

L. **Highest or Otherwise Best Offer.** The Debtors determined, in a valid and sound exercise of their business judgment and in accordance with the Bidding Procedures Order and the Bidding Procedures, that the Successful Bid and the Purchase Agreement represent the highest or otherwise best offer reasonably obtainable for the Purchased Assets. The Sale will maximize the value of the Debtors' estates and provide a greater recovery than any presently available alternative.

M. **Consideration and Best Interests.** The consideration to be provided under the Purchase Agreement is fair and reasonable, constitutes reasonably equivalent value and fair consideration for the Purchased Assets, and presents the best opportunity to realize maximum value. Delay in consummating the Sale could jeopardize the value of the Nomad Internet business and impair recoveries for the Debtors' estates and stakeholders.

N. The Bidding Procedures afforded all interested parties a full, fair, and reasonable opportunity to submit a higher or otherwise better offer, and the Debtors have demonstrated a sound business purpose and compelling circumstances for consummating the Sale before confirmation of a chapter 11 plan.

O. **Arm's-Length Sale and Good Faith.** The Purchase Agreement, the Successful Bid, and the Sale were negotiated and undertaken at arm's length, without collusion or fraud, and in good faith within the meaning of section 363(m) of the Bankruptcy Code. Castel and, if applicable, Glenmont Resources participated in the Bidding Procedures in good faith, and the Successful Bid was not controlled by any agreement among bidders.

P. **No Fraudulent Transfer.** The consideration provided under the Purchase Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and applicable law. The Purchase Agreement was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors, and neither the Debtors nor Castel engaged in any fraudulent or otherwise improper purpose.

Q. **Free and Clear Transfer Required by Successful Bidder.** The Successful Bidder would not have entered into the Purchase Agreement or consummated the Sale if the Purchased Assets were not transferred free and clear of all Liens, claims, interests, encumbrances, and liabilities other than the Assumed Liabilities and as otherwise provided in the Purchase

Agreement. A free-and-clear sale is necessary to maximize value for the Debtors' estates and provide certainty to the Successful Bidder.

R. As of the Closing, subject to the terms of the Purchase Agreement and this Order, the Sale will constitute a legal, valid, enforceable, and effective transfer of the Purchased Assets to the Successful Bidder and will vest the Successful Bidder with all right, title, and interest of the Debtors in the Purchased Assets free and clear of all Interests other than the Assumed Liabilities and as otherwise provided in the Purchase Agreement, with such Interests attaching to the net proceeds of the Sale with the same nature, validity, priority, extent, perfection, and force and effect that such Interests had against the Purchased Assets immediately before the Closing, subject to the Debtors' rights, claims, and defenses.

S. **Satisfaction of Section 363(f) Standards.** The Debtors are authorized to sell the Purchased Assets free and clear of all Interests other than the Assumed Liabilities and as otherwise provided in the Purchase Agreement because, with respect to each holder of an Interest, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Each holder has consented, is deemed to have consented, could be compelled in a legal or equitable proceeding to accept money satisfaction, or otherwise falls within section 363(f).

T. Those holders of Interests that did not object, or that withdrew their objections, are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders that did object fall within one or more of the other subsections of section 363(f), and their Interests shall attach to the net proceeds of the Sale attributable to the Purchased Assets in the same order of priority and with the same validity, force, and effect as before the Sale, subject to the Debtors' rights, claims, and defenses.

U. **No Successor Liability.** Neither the Successful Bidder nor any of its affiliates or designees shall be deemed, as a result of the Sale, to be a legal successor to the Debtors, to have merged with or into the Debtors, or to be an alter ego, mere continuation, substantial continuation, or successor of the Debtors. Neither the Successful Bidder nor any of its affiliates or designees shall assume or be responsible for any liability or obligation of the Debtors other than the Assumed Liabilities and obligations expressly provided in the Purchase Agreement.

V. **Assumption and Assignment; Verizon Agreement.** The Assumed Contracts listed on the Cure Schedule, including the Verizon Agreement with Cellco Partnership d/b/a Verizon Wireless, are necessary to the Sale and may be assumed and assigned pursuant to section 365 of the Bankruptcy Code. The Closing is conditioned on Verizon's consent to the assumption and assignment of the Verizon Agreement and execution of the Amended Verizon Agreement.

W. **Cure Costs and Adequate Assurance.** Cure Costs for the Assumed Contracts are to be paid by the Debtors at or before the Closing. The Successful Bidder has provided, or will provide at Closing, adequate assurance of future performance sufficient to satisfy sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code, subject to the terms of the Purchase Agreement and this Order.

X. **Compelling Reasons; No *Sub Rosa* Plan; Transfer Taxes.** Good and sufficient reasons support prompt consummation of the Sale outside a chapter 11 plan, and the Sale does not constitute a *sub rosa* chapter 11 plan. To the extent the Sale is consummated pursuant to the Plan, the transfer of the Purchased Assets is exempt from transfer, stamp, recording, conveyance, or similar taxes to the maximum extent provided by section 1146(a) of the Bankruptcy Code.

Y. **Finality and Immediate Effect.** Time is of the essence in consummating the Sale, and Closing must occur no later than November 16, 2026. Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to the extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure as made applicable by Bankruptcy Rule 7054, there is no just reason for delay, any stay is waived, and this Order shall be effective and enforceable immediately upon entry.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

1. **Objections Overruled.** All objections, if any, to the relief sought in the Motion, the Sale, the Purchase Agreement, the Stalking Horse APA, the Assumed Contracts, the Cure Costs, or the entry of this Order that have not been withdrawn, waived, settled, or otherwise resolved are overruled on the merits with prejudice. All persons and entities that failed to timely object are deemed to have consented to the relief granted herein, including pursuant to section 363(f)(2) of the Bankruptcy Code.

2. **Approval.** Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, the Motion is granted and the Sale, the Purchase Agreement, the Stalking Horse APA, all ancillary documents, and all transactions contemplated thereby are approved. Castel is approved as the Stalking Horse Bidder. The Break-Up Fee of 3% of the Stalking Horse Purchase Price, equal to $25,500.00, and the Expense Reimbursement Amount of up to $60,000.00 (collectively, the "**Bid Protections**") under section 9.3 of the Stalking Horse APA are approved as actual and necessary expenses of preserving the Debtors' estates and are allowed as administrative expenses under sections 503(b) and 507(a)(2) of the Bankruptcy Code, payable only upon consummation of a competing transaction and solely from the proceeds of that transaction. The Stalking Horse APA's $1,164,500 cash purchase price, subject to the Subscriber Adjustment, and 10% good-faith

deposit held by the Escrow Agent are approved in accordance with the Stalking Horse APA. Because Castel is the Successful Bidder, the Bid Protections are not expected to become payable.

3. Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Debtors are authorized and directed to consummate the Sale and to sell, transfer, and assign all of the Debtors' right, title, and interest in and to the Purchased Assets to Castel as the Successful Bidder, free and clear of all Interests other than the Assumed Liabilities and as otherwise provided in the Purchase Agreement, with Interests attaching to the net proceeds of the Sale in accordance with this Order.

4. The Debtors, Castel, and their respective officers, employees, agents, and representatives are authorized and directed to take all actions and execute all instruments reasonably necessary or desirable to consummate, implement, and close the Sale, the Purchase Agreement, the Stalking Horse APA, the Amended Verizon Agreement, the assumption and assignment of the Assumed Contracts, and all other transactions contemplated thereby, without further order of this Court, subject to the terms and conditions of the Purchase Agreement.

5. Neither the Debtors nor Castel shall be obligated to consummate the Sale except as contemplated by and provided in the Purchase Agreement. The automatic stay under section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement this Order and the transactions contemplated by the Purchase Agreement.

6. **Binding Effect of Order.** This Order, the Purchase Agreement, the Stalking Horse APA, and the transactions contemplated thereby shall be binding in all respects upon the Debtors, their estates, all creditors and equity holders, all holders of Interests in or against the Purchased Assets, all Contract Counterparties, Castel, Glenmont Resources to the extent applicable as Backup Bidder, and all successors and assigns of the foregoing, notwithstanding any

subsequent appointment of a trustee, examiner, or other fiduciary or any conversion or dismissal of these chapter 11 cases.

7. **No Material Modifications.** The Purchase Agreement and related agreements may be modified, amended, or supplemented in accordance with their terms without further order of this Court, *provided* that no such modification, amendment, or supplement has a material adverse effect on the Debtors or their estates, including through a reduction of the Successful Bid.

8. **Transfer of Assets Free and Clear.** Except as expressly provided in the Purchase Agreement or this Order, upon the Closing the Purchased Assets shall be transferred to Castel, as the Successful Bidder, free and clear of all Liens, claims, interests, encumbrances, and liabilities of any kind or nature whatsoever (collectively, "**Interests**"), other than the Assumed Liabilities and obligations expressly assumed under the Purchase Agreement, to the maximum extent permitted by section 363(f) of the Bankruptcy Code. For purposes of this Order, Interests include:

(i) all liens, whether consensual or statutory, including mortgages, deeds of trust, pledges, security interests, charges, options, rights of first refusal or first offer, easements, encroachments, servitudes, and any other interest that constitutes a lien or an "interest" for purposes of section 363(f) of the Bankruptcy Code, including any adequate protection or replacement liens granted under sections 361, 363, or 364 of the Bankruptcy Code (collectively, "**Liens**");

(ii) any and all claims as defined in section 101(5) of the Bankruptcy Code, including claims based on or arising from the Debtors, the Nomad Internet business, the Purchased Assets, the Assumed Contracts, pre-Closing conduct or liabilities, taxes, employment or benefit matters, successor or transferee liability, bulk-sales or similar laws, and any other claims or causes of action asserted against the Debtors or the Purchased Assets (collectively, "**Claims**"); and

(iii) any and all liabilities, obligations, debts, judgments, assessments, losses, damages, penalties, fines, fees, interest, deficiencies, costs, expenses, and other liabilities of every kind and description, whether direct or indirect, absolute or contingent, liquidated or unliquidated, known or unknown, matured or unmatured, disputed or undisputed, or due or to become due (collectively, "**Liabilities**");

In each case, Interests include matters arising before, on, or after the Petition Date or before the Closing, whether at law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, allowed or disallowed, contingent or noncontingent, liquidated or unliquidated, material or nonmaterial, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity, or otherwise. All Interests other than the Assumed Liabilities and obligations expressly assumed under the Purchase Agreement shall attach to the net proceeds of the Sale with the same nature, validity, priority, extent, perfection, and force and effect that such Interests had against the Purchased Assets immediately before the Closing, subject to the Debtors' claims, defenses, and objections.

9. **Assumption and Assignment of Assumed Contracts.** Pursuant to section 365 of the Bankruptcy Code, the Debtors are authorized to assume and assign to Castel, as the Successful Bidder, the Assumed Contracts listed on the Cure Schedule attached to the Motion as Exhibit B, including the Verizon Agreement, and Castel is authorized to accept such assignment, subject to payment of the Cure Costs and satisfaction or waiver of the applicable conditions in the Purchase Agreement and this Order.

10. **Cure Costs; Verizon Agreement.** The Cure Costs set forth on the Cure Schedule attached as Exhibit B to the Motion are approved to the extent not timely disputed and shall be paid by the Debtors at or before the Closing. The Closing shall remain conditioned on Cellco Partnership d/b/a Verizon Wireless consenting to the assumption and assignment of the Verizon Agreement and the parties executing the Amended Verizon Agreement. Upon payment of the applicable Cure Costs and Closing, no pre-Closing default under an Assumed Contract shall be asserted against Castel except as expressly provided in the Purchase Agreement or this Order.

11. **Adequate Assurance of Future Performance.** Castel's obligations to perform the Assumed Contracts from and after the Closing, together with the terms of the Purchase Agreement and the Amended Verizon Agreement, constitute adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code. If Glenmont Resources becomes the Backup Bidder purchaser, the same determination shall apply to Glenmont Resources upon satisfaction of the applicable requirements under the Purchase Agreement and this Order.

12. **No Successor Liability.** Neither Castel nor any of its affiliates, designees, successors, or assigns shall have any liability or responsibility for any Interest or Excluded Liability of the Debtors, including any liability based on successor, transferee, derivative, or vicarious liability, de facto merger, continuation, or similar theory, other than the Assumed Liabilities and obligations expressly assumed under the Purchase Agreement.

13. **Release of Interests.** Effective upon the Closing, this Order shall be effective as a determination that all Interests existing as to the Purchased Assets before the Closing, other than the Assumed Liabilities and obligations expressly assumed under the Purchase Agreement, have been unconditionally released, discharged, and terminated as to the Purchased Assets, with such Interests attaching to the net proceeds of the Sale as provided herein.

14. **Approval to Release Interests.** Any holder of a Lien or other Interest that has not delivered appropriate termination statements, releases, or other instruments before the Closing is authorized and directed to release its Interest. Castel is authorized to file, register, or record a certified copy of this Order, which shall constitute conclusive evidence of the release of Interests against the Purchased Assets, and this Order shall be deemed recordable in each applicable filing or recording system.

15. **Surrender of Possession.** All persons and entities in possession or control of any Purchased Assets shall surrender possession of those assets to Castel at the Closing, free and clear of all Interests other than the Assumed Liabilities and as otherwise provided in the Purchase Agreement.

16. **Backup Bidder.** Glenmont Resources is approved as the Backup Bidder with a Backup Bid of $1,240,000. If the Sale to Castel fails to close in accordance with the Purchase Agreement, the Debtors are authorized, without further order of this Court, to consummate the Sale with Glenmont Resources pursuant to the Backup Bid and the applicable purchase agreement, subject to satisfaction or waiver of the applicable closing conditions and the other terms of this Order.

17. **Stalking Horse Bidder and Bid Protections.** Castel is approved as the Stalking Horse Bidder, and the Stalking Horse APA is approved as the stalking horse purchase agreement. The Bid Protections are payable only if the Stalking Horse APA is terminated as a result of the Debtors' consummation of a competing transaction, only upon consummation of that competing transaction, and solely from the proceeds of that transaction. The Bid Protections shall not be payable in connection with the Sale to Castel as the Successful Bidder.

18. **Prohibition of Actions Against Successful Bidder.** Except for the Assumed Liabilities and obligations expressly provided in the Purchase Agreement or this Order, all persons and entities are permanently enjoined from asserting, prosecuting, or otherwise pursuing any Interest or Excluded Liability against Castel, its affiliates, successors, assigns, or the Purchased Assets conveyed under this Order.

19. **No Interference.** Following the Closing, no holder of an Interest shall interfere with Castel's title to or use and enjoyment of the Purchased Assets based on or related to that Interest, the Debtors' obligations, or the Sale.

20. **Retention of Jurisdiction.** This Court retains exclusive jurisdiction to interpret, implement, and enforce this Order, the Purchase Agreement, the Stalking Horse APA, the Bid Procedures Order, the assumption and assignment of the Assumed Contracts, and all related agreements; to resolve disputes arising from or relating to the Sale; to compel delivery of the Purchased Assets or performance of obligations; to protect Castel, Glenmont Resources if applicable, and the Purchased Assets from Interests and successor liability; and to grant such other relief as may be necessary to effectuate this Order.

21. **Immediate Effect; Waiver of Stays.** Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon entry and shall not be subject to any stay. The requirements of Bankruptcy Rules 6004 and 6006 are satisfied or waived to the extent necessary, and the Debtors and Castel may close the Sale promptly in accordance with the Purchase Agreement.

22. **Good Faith Purchaser.** The Sale to Castel is undertaken in good faith and without collusion within the meaning of section 363(m) of the Bankruptcy Code. Castel shall be entitled to all protections afforded by section 363(m), and reversal or modification on appeal shall not affect the validity of the Sale unless authorization to consummate the Sale is duly stayed pending appeal.

23. There has been no showing that the Debtors, Castel, Glenmont Resources, or any of their respective affiliates or representatives engaged in conduct that would cause or

permit the Sale, the Purchase Agreement, or the Stalking Horse APA to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.

24. **Inconsistencies with Prior Orders, Pleadings, or Agreements.** To the extent of any conflict between this Order and the Purchase Agreement, the terms of this Order shall govern and control, except that nothing in this Order modifies or waives any closing condition or termination right in the Purchase Agreement. To the extent this Order conflicts with any prior order or pleading in these chapter 11 cases, this Order shall govern to the extent necessary to permit consummation of the Sale.

25. **Application of Sale Proceeds; Subsequent Orders and Plan Provisions.** The net proceeds of the Sale, after payment of amounts required to be paid at Closing under the Purchase Agreement, shall be retained by the Debtors' estates and distributed in accordance with the Plan or further order of this Court. Nothing in this Order authorizes any distribution of Sale proceeds to any creditor or interest holder except as provided herein or by further order of this Court. Unless otherwise agreed by the Debtors and Castel, no chapter 11 plan, confirmation order, or subsequent order shall modify, impair, restrict, or conflict with this Order, the Purchase Agreement, the Stalking Horse APA, or the rights granted to Castel or Glenmont Resources if applicable, and any such order shall be construed consistently with this Order.

26. **Failure to Specify Provisions.** The failure to specify or include any particular provision of the Purchase Agreement, the Stalking Horse APA, or another related document in this Order shall not diminish or impair the effectiveness of that provision, it being the intent of this Court that the Purchase Agreement, the Stalking Horse APA, and the related documents be authorized and approved in their entirety.

27. **Closing Deadline and Conditions Precedent.** Neither Castel nor the Debtors shall be obligated to close the Sale until the conditions precedent in the Purchase Agreement have been satisfied or waived in accordance with its terms. The Closing shall occur as soon as practicable after entry of this Order and in no event later than November 16, 2026, subject to the Purchase Agreement, the Verizon consent and Amended Verizon Agreement condition, and the other conditions expressly set forth therein.

28. **Provisions Non-Severable; Time Periods.** The provisions of this Order are non-severable and mutually dependent. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

29. Notwithstanding the applicability of any of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014 or any other provisions of the Bankruptcy Rules or the Local Rules to the contrary, the terms and provisions of this Order shall be immediately effective and enforceable upon its entry and any applicable stay of the effectiveness and enforceability of this Order is hereby waived.

30. The Debtors are authorized to make non-substantive changes to the Bidding Procedures and any related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors.

31. This Court shall retain exclusive jurisdiction over any and all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

# # # End of Order # # #

Prepared by:

*/s/ Omar J. Alaniz*

**REED SMITH LLP**
Omar J. Alaniz (SBN 24040402)
Taylre C. Janak (SBN 24122751)
Haley B. Bray (SBN 24143584)

2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
Telephone: (469) 680-4200
Facsimile: (469) 680-4299
E-mail: oalaniz@reedsmith.com
tjanak@reedsmith.com
hbray@reedsmith.com

-and-

**REED SMITH LLP**
Amalia Sax-Bolder (*admitted pro hac vice*)
1400 Wewatta St
Suite 350
Denver, CO 80202
Telephone: (303) 552-3800
Facsimile: (303) 552-3799
E-mail: asaxbolder@reedsmith.com

*Attorneys for the Debtors and Debtors-in-Possession*

# EXHIBIT 1

# ASSET PURCHASE AGREEMENT

**This Asset Purchase Agreement** (this "Agreement") is entered into as of October 20, 2026**,** 2026, by and between GEV IO LLC d/b/a Nomad Internet, a Texas limited liability company ("Nomad Internet"), and Everywhere Internet, LLC, a Texas limited liability company ("Everywhere Internet" together, the "Sellers" and each a "Seller"), each as a debtor and debtor-in-possession in Case No. 26-31546 (jointly administered) (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court"), and Castel Network Partners, LLC, a Washington limited liability company (the "Buyer"). Each of the Sellers and the Buyer are each referred to herein as a "Party" and collectively as the "Parties."

## RECITALS

**WHEREAS**, the Sellers are in the business of providing unlimited fixed-wireless broadband and operate as a mobile virtual network operator on Verizon's 4G LTE/5G network, serving consumers across all fifty states (the "Business");

**WHEREAS**, the Sellers filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on April 8, 2026 (the "Petition Date"), and are operating as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, the Parties desire to enter into this Agreement pursuant to which, among other things, the Sellers will sell to the Buyer and the Buyer will purchase from the Sellers all of the Sellers' rights, title, and interest into and under the Purchased Assets (as hereinafter defined), free and clear of all Liens, claims, interests, and encumbrances, and the Buyer shall assume from the Sellers only the Assumed Liabilities upon the terms and subject to the conditions set forth herein; and

**WHEREAS**, the transactions contemplated by this Agreement are subject to (a) the approval of the Bankruptcy Court and would be consummated only pursuant to a Sale Order (as hereinafter defined) to be entered by the Bankruptcy Court and Sections 1123(a)(5), 1123(b)(4), 1141(c), and 1142(b) of the Bankruptcy Code, and (b) to the satisfaction of the conditions to closing set forth in ARTICLE VI.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.1 Definitions.** As used in this Agreement, the following terms shall have the meanings set forth below:

"Active Paying Subscriber" means a subscriber with an active subscription to the Business's wireless connectivity service that is current (i.e., not more than thirty (30) days past due) as of the Measurement Date, as verified against the Chargebee subscription ledger and Verizon line-level billing records.

"Amended Verizon Agreement" means an amended or amended and restated Wireless Connectivity Agreement (or amendment thereto) between the Buyer (or its designee) and Cellco Partnership d/b/a Verizon Wireless, on terms reasonably acceptable to the Buyer, which agreement shall, at a minimum, provide for (i) a term of not less than three (3) years with automatic renewal, (ii) alignment regarding

pricing and volume discounts, upon terms reasonably acceptable to the Buyer, (iii) transition and wind-down rights upon termination or expiry, upon terms reasonably acceptable to the Buyer, and (iv) a Transition Audit Period, during which the Buyer may terminate or suspend any line in its sole discretion, effective on the date of delivery of the Buyer's request, and Verizon Wireless (as hereinafter defined) shall not charge any early termination fee, Offer Recovery Fee, deactivation fee, or other penalty for any line under review during this period, in each case which shall become effective as of immediately following the Closing.

"Assigned Contracts" has the meaning set forth in Section 1.2(e).

"Assumed Contracts" means those Assigned Contracts to be assumed by the Sellers and assigned to the Buyer pursuant to this Agreement and the Sale Order.

"Assumed Liabilities" has the meaning set forth in Section 1.4.

"Avoidance Actions" means any avoidance, recovery, or subordination actions or remedies that may be brought by or on behalf of the Sellers or their estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies arising under Sections 510 and 541 through 553 of the Bankruptcy Code.

"Bankruptcy Case" has the meaning set forth in the preamble.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

"Bankruptcy Court" has the meaning set forth in the preamble.

"Bidding Procedures Order" means the *Order Approving Bidding Procedures in Connection with the Plan Sponsor Selection, Authorizing Stalking Horse Selection, Scheduling an Auction, and Granting Related Relief* [Docket No. 139][1].

"Business Day" means any day other than a Saturday, Sunday, or other day on which banks in Texas are authorized or required by law to close.

"Cause of Action" means, without limitation, any and all claims, causes of action, proceedings, agreements, controversies, demands, debts, rights, actions, Avoidance Actions, Liens, indemnities, guaranties, suits, obligations, liabilities, damages, judgments, accounts, injuries, remedies, defenses, offsets, powers, privileges, recoupments, cross-claims, counterclaims, third-party claims or actions, indemnity claims, contribution claims, or any other claim, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, accrued or to accrue, foreseen or unforeseen, whether assertable directly or derivatively, whether pending in litigation or otherwise, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.

"Closing" has the meaning set forth in Section 6.1.

"Closing Date" has the meaning set forth in Section 6.1.

"Closing Subscriber Statement" has the meaning set forth in Section 2.3(a).

---

[1] Note to Draft: Sellers to provide docket number.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Sellers' joint chapter 11 plan pursuant to Section 1129 of the Bankruptcy Code.

"Due Diligence Period" means the period commencing on the date of this Agreement and ending twenty (20) Business Days following the date of this Agreement.

"Escrow Agent" means Erik White, Chief Restructuring Officer of the Sellers.[2]

"Estate Causes of Action" means, individually and collectively, any Cause of Action that is property of the estates of the Sellers as of the Closing Date.

"Excluded Assets" has the meaning set forth in Section 1.3.

"Excluded Liabilities" has the meaning set forth in Section 1.5.

"Governmental Authority" means any federal, state, local, or foreign government, or any agency, bureau, board, commission, court, department, instrumentality, political subdivision, or other governmental entity or authority.

"Good Faith Deposit" has the meaning set forth in Section 2.1(b).

"Knowledge of the Sellers" means the actual knowledge of Erik White, Chief Restructuring Officer of the Sellers, after reasonable due inquiry.

"Lien" means any lien, pledge, hypothecation, encumbrance, security interest, or other charge of any kind.

"Material Adverse Change" means any event, change, effect, or occurrence that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on (i) the business, assets, financial condition, or results of operations of the Business, taken as a whole, or (ii) the ability of the Sellers to consummate the transactions contemplated by this Agreement. None of the following shall constitute or be taken into account in determining whether a Material Adverse Change has occurred: (a) changes in general economic, financial, credit, securities, or political conditions; (b) changes generally affecting the fixed-wireless broadband and MVNO industry, but only to the extent such changes affect similarly situated competitors in such industry to a substantially similar degree; (c) changes in applicable law or accounting rules of general applicability that do not specifically target or disproportionately affect the Business or the telecommunications industry; or (d) effects resulting from the filing or pendency of the Bankruptcy Case or from public announcement of this Agreement or the transactions contemplated hereby. Notwithstanding the foregoing, none of the following shall be subject to any carve-out and each shall be deemed to constitute a Material Adverse Change: (w) any termination, cancellation, non-renewal, or material adverse modification of the Verizon Agreement, or any written notice from Verizon of its intention to terminate, not renew, or materially and adversely modify the Verizon Agreement or decline to enter into the Amended Verizon Agreement on terms reasonably acceptable to the Buyer; (x) the loss of five percent (5%) or more of Active Paying Subscribers in any rolling thirty (30)-day period (measured against the subscriber count at the beginning of such period); (y) the termination, cancellation, or material breach of any other material contract (including any Customer Contract or material SaaS or payment-processing

[2] Note to Sellers' counsel: We've assumed that there is no current plan to enter into a separate Good Faith Deposit/Escrow Agreement so we've deleted all references thereto herein so that this Agreement governs. Also, please confirm that no provision of the Bidding Procedures Order provides for forfeiture of the stalking horse's deposit on terms that conflict with Section 3.1(b). If any such conflict exists, the parties should conform the Bidding Procedures Order language or add a carve-out preserving the Buyer's return right under this Agreement.

agreement); or (z) any adverse regulatory, enforcement, or licensing action by any Governmental Authority specifically targeting the Business or the Sellers' authority to operate the Business. For the avoidance of doubt, the Sellers shall bear the burden of demonstrating that any event, change, effect, or occurrence falls within a carve-out set forth in clauses (a) through (d) above and does not have a disproportionate adverse effect on the Business relative to other similarly situated businesses in the fixed-wireless broadband and MVNO industry.

"Outside Date" has the meaning set forth in Section 7.2(b).

"Person" means any individual, partnership, limited liability company, corporation, association, joint stock company, trust, joint venture, unincorporated organization, or Governmental Authority.

"Petition Date" has the meaning set forth in the preamble.

"Purchase Price" has the meaning set forth in Section 2.1.

"Purchased Assets" has the meaning set forth in Section 1.2.

"Sale Motion" means the motion or motions filed by the Sellers with the Bankruptcy Court seeking entry of the Sale Order.

"Sale Order" means an order or orders of the Bankruptcy Court, which may be the Confirmation Order, in form and substance reasonably satisfactory to the Buyer and the Sellers, authorizing and approving the Sale Transaction under the Plan and the transfer of the Purchased Assets to the Buyer pursuant to Sections 1123(a)(5), 1123(b)(4), 1141(c), and 1142(b) of the Bankruptcy Code, free and clear of all Liens, claims, interests, and encumbrances (other than Assumed Liabilities). The Sale Order shall provide for waiver of the fourteen (14)-day stays under Bankruptcy Rules 6004(h) and 6006(d), and shall provide that the Buyer is a good faith purchaser entitled to all protections available under applicable law, including protections analogous to those afforded by Section 363(m) of the Bankruptcy Code, to the fullest extent permitted by law.

"Subscriber Adjustment" has the meaning set forth in Section 2.3(b).

"Subscriber Floor" has the meaning set forth in Section 2.3(a).

"Successful Bidder" means the bidder selected by the Sellers pursuant to the Bidding Procedures Order and as defined therein.

"Transition Audit Period" means the ninety (90)-day period, commencing as of the day immediately succeeding the Closing Date and ending on the date that is ninety (90) days thereafter, during which the Buyer will review the active subscriber base for evidence of non-payment, fraud, or violation of authorized use.

"Transition Services Agreement" means that certain transition services agreement, in form and substance reasonably acceptable to the Buyer and the Sellers, to be entered into at Closing, pursuant to which certain employees and contractors of the Sellers shall provide transition support services to the Buyer during a short-term transitional period following the Closing, on terms to be mutually agreed by the Parties.

"Verizon Agreement" means that certain Wireless Connectivity Agreement by and between Everywhere Internet, LLC and Cellco Partnership d/b/a Verizon Wireless ("Verizon Wireless"), effective

March 14, 2023, as may have been amended, restated, supplemented, or otherwise modified from time to time.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

**Section 2.1** **Purchased Assets.** Subject to the terms and conditions of this Agreement and the Sale Order, at the Closing, the Sellers shall sell, transfer, assign, convey, and deliver to the Buyer, and the Buyer shall purchase and accept from the Sellers, free and clear of all Liens, claims, interests, and encumbrances (other than Assumed Liabilities) pursuant to Sections 1123(a)(5), 1123(b)(4), 1141(c), and 1142(b) of the Bankruptcy Code, all of the Sellers' respective right, title, and interest in and to the following assets (collectively, the "Purchased Assets"):

(a) all equipment, devices, towers, antennas, and other tangible personal property owned by the Sellers and used in the operation of the wireless connectivity business, including, but not limited to, the modem and CPE fleet (including devices deployed in the field and spare inventory), and all office furniture, fixtures, equipment, and collectibles, as more particularly described on Schedule 2.1(a);

(b) all of the Sellers' right, title, and interest in the Verizon Agreement, together with all associated Company IDs, billing profiles, SIM inventory, and ThingSpace account access;

(c) all customer relationships, customer lists, and customer data, and all contracts, agreements or instruments (including, for the avoidance of doubt, subscriber agreements) between the Sellers and their customers (collectively, "Customer Contracts");

(d) all intellectual property and intellectual property rights, including trademarks, trade names (including "Nomad Internet"), domain names, websites, e-commerce platforms, software, source code, the operating platform, workflow automations and configurations, and other technology, as more particularly described on Schedule 2.1(d);

(e) to the extent assignable (i.e., to the extent the following constitute Assumed Contracts), all of the Sellers' right, title, and interest in those contracts and agreements set forth on Schedule 2.1(e) (collectively, the "Assigned Contracts"), including, for the avoidance of doubt, the Verizon Agreement, all Customer Contracts, the operating platform, and all material third-party SaaS and payment-processing agreements, including Chargebee, ShipStation, FreeScout, Zoho, Botpress, n8n, Twilio, Slack, and related infrastructure;

(f) to the extent assignable, all permits, licenses, approvals, authorizations, and FCC licenses, if any, relating to the wireless connectivity business, to the extent transferable;

(g) all books, records, files, and other documents relating to the wireless connectivity business;

(h) all accounts receivable and other rights to payments of the Sellers attributable to the Purchased Assets; and

(i) all goodwill associated with the wireless connectivity business.

**Section 2.2** **Excluded Assets.** Notwithstanding anything to the contrary in this Agreement, the Purchased Assets shall not include the following assets (collectively, the "Excluded Assets"):

(a) all cash, cash equivalents, bank accounts, and deposits of the Sellers;

(b) all tax refunds and tax attributes of the Sellers;

(c) all insurance policies of the Sellers and all rights, claims, credits, or refunds thereunder;

(d) all employee-related assets, including payroll records, employee benefit plans, and related assets;

(e) all Estate Causes of Action, including all Avoidance Actions and other Causes of Action of the Sellers;

(f) all assets of the Sellers not specifically included in the definition of Purchased Assets; and

(g) any other assets set forth on Schedule 2.2.

**Section 2.3 Assumed Liabilities.** At the Closing, the Buyer shall assume and agree to pay, perform, and discharge when due only the following liabilities and obligations of the Sellers (collectively, the "Assumed Liabilities"), and no others:

(a) all liabilities and obligations arising under the Assumed Contracts, but only to the extent such liabilities and obligations (i) first arise and accrue from and after the Closing Date, (ii) relate solely to periods from and after the Closing Date, and (iii) do not arise from or relate to any breach, default, violation, act, omission, event, circumstance, or condition occurring or existing prior to the Closing Date or any failure by the Sellers to perform or comply with any obligation prior to the Closing Date, regardless of when any claim with respect thereto is asserted or any liability with respect thereto becomes due or payable.

**Section 2.4 Excluded Liabilities.** Except for the Assumed Liabilities (as expressly limited by Section 1.4), the Buyer shall not assume, and shall have no liability or obligation with respect to, any liabilities or obligations of the Sellers of any kind or nature whatsoever, whether known or unknown, contingent or absolute, matured or unmatured, accrued or unaccrued, asserted or unasserted, or determined or determinable, including all liabilities and obligations arising out of or relating to the operation or ownership of the Purchased Assets or the Business prior to the Closing Date, regardless of when such liabilities or obligations become known, are asserted, or become due (collectively, the "Excluded Liabilities"). The Buyer's acquisition of the Purchased Assets pursuant to this Agreement and the Sale Order shall be free and clear of all Excluded Liabilities pursuant to Sections 363(f) and 1141(c) of the Bankruptcy Code. Without limiting the generality of the foregoing, the Excluded Liabilities shall include:

(a) all liabilities and obligations of the Sellers arising under or relating to the Bankruptcy Case, including all administrative claims, priority claims, and unsecured claims, and all other liabilities and obligations of the Sellers arising prior to the Closing Date;

(b) all liabilities for taxes of the Sellers;

(c) all liabilities and obligations related to any employee benefit plan or arrangement of the Sellers;

(d) all environmental liabilities and obligations of the Sellers, including any liabilities or obligations relating to the operation of the wireless connectivity business or the condition of the Purchased Assets;

(e) all accrued or unpaid carrier invoices for periods prior to the Closing Date;

(f) all liabilities and obligations arising from or relating to any litigation, or refund claims, in each case arising from events or periods prior to the Closing Date;

(g) all obligations or liabilities owed to or for the benefit of any insider or founder of the Sellers;

(h) all liabilities and obligations arising from or relating to any breach, default, violation, tort, infringement, failure to perform, or noncompliance by the Sellers or any of their affiliates, officers, directors, employees, agents, or representatives occurring or existing prior to the Closing Date, regardless of when such liability becomes known, is asserted, or becomes due;

(i) all liabilities and obligations under the Assumed Contracts that are excluded from Assumed Liabilities pursuant to Section 1.4(a), including any liability arising from or relating to any breach, default, act, omission, event, or circumstance occurring or existing prior to the Closing Date;

(j) any brokerage, finder's, or other fee or commission from the Sellers in connection with the transactions contemplated by this Agreement; and

(k) all other liabilities and obligations of the Sellers not expressly assumed by the Buyer as Assumed Liabilities.

## ARTICLE III
## PURCHASE PRICE AND GOOD FAITH DEPOSIT

**Section 3.1 Purchase Price.**

(a) Subject to the adjustment set forth in Section 2.3, the aggregate purchase price for the Purchased Assets shall consist of $1,164,500.00 in cash (the "Purchase Price"), payable as set forth in Section 2.2.

(b) **Good Faith Deposit.** Upon execution of this Agreement, the Buyer shall immediately deposit with the Escrow Agent an amount equal to ten percent (10%) of the Purchase Price (the "Good Faith Deposit"), in immediately available funds via wire transfer, to be held and released by the Escrow Agent in accordance with the provisions of this Agreement, and the Bidding Procedures Order. The Escrow Agent shall open an account that will hold only, and keep segregated from (x) all other property of the estates of the Sellers and (y) all other property held by the Escrow Agent, the Good Faith Deposit, and such account shall be accessible only by the Escrow Agent. The Good Faith Deposit shall be credited against the Purchase Price at Closing; *provided*, *however*, for the avoidance of doubt, if the Closing fails to be consummated the Good Faith Deposit shall be returned to the Buyer. For the avoidance of doubt, the Escrow Agent shall not disburse the Good Faith Deposit except as consistent with this Agreement or an order of the Bankruptcy Court. The Good Faith Deposit shall be held in trust for the benefit of the Buyer and shall not constitute property of the Sellers' estates unless and until released to the Sellers in accordance with this Agreement; if this Agreement is terminated, the Good Faith Deposit shall be returned to the Buyer

within two (2) Business Days thereafter; and if Erik White ceases to serve as Chief Restructuring Officer of the Sellers or the Bankruptcy Case is converted or dismissed, the Good Faith Deposit shall promptly be returned to the Buyer or transferred to a successor escrow agent reasonably acceptable to the Buyer, to be held on the terms of this Section 3.1(b).

**Section 3.2** **Payment at Closing.** At the Closing, the Buyer shall pay to the Sellers (or as otherwise directed by the Bankruptcy Court) the Purchase Price, less the Good Faith Deposit, by wire transfer of immediately available funds to an account designated in writing by the Sellers no later than two (2) Business Days prior to the Closing Date.

**Section 3.3** **Subscriber Adjustment.**

(a) Not later than two (2) Business Days prior to the Closing Date, the Sellers shall deliver to the Buyer a certificate (the "Subscriber Certificate" or "Closing Subscriber Statement") setting forth the number of Active Paying Subscribers as of a date no earlier than three (3) Business Days prior to the anticipated Closing Date (the "Measurement Date"), together with supporting detail from the Chargebee subscription ledger and the Verizon line-level billing records. For purposes of this Agreement, the "Subscriber Floor" shall be 3,800 Active Paying Subscribers.

(b) If the number of Active Paying Subscribers as of the Measurement Date is fewer than the Subscriber Floor, the Purchase Price payable at Closing shall be reduced by an amount equal to the product of (x) the number of Active Paying Subscribers below the Subscriber Floor (i.e., the Subscriber Floor minus the actual count) *multiplied by* (y) the Per-Subscriber Value (such reduction, the "Subscriber Adjustment"). For the avoidance of doubt, no adjustment shall be made if the number of Active Paying Subscribers equals or exceeds the Subscriber Floor.

(c) For purposes of this Section 2.3, "Per-Subscriber Value" means an amount equal to One Hundred and Eighty-Five Dollars ($185.00).

**Section 3.4** **Purchase Price Allocation**. Within ninety (90) days after the Closing Date, the Buyer shall prepare and deliver to the Sellers an allocation of the Purchase Price (and all other consideration) among the Purchased Assets in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code"), and the Treasury Regulations promulgated thereunder (the "Allocation"). The Sellers shall have thirty (30) days following receipt of the Allocation to review and raise any objections. If the Sellers do not object within such period, the Allocation shall be final and binding. If the Sellers timely object, the Parties shall negotiate in good faith to resolve any disagreement, and if unable to do so within fifteen (15) days, shall submit the dispute to the independent accountant. Each Party shall (a) file all tax returns (including IRS Form 8594) consistent with the Allocation (as finally determined), (b) not take any position inconsistent with the Allocation on any tax return or in any proceeding before any taxing authority, and (c) cooperate with each other in the preparation and timely filing of all tax returns related to the Allocation.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

**Section 4.1** **Representations and Warranties of the Sellers.** The Sellers represent and warrant to the Buyer as follows, subject in all respects to the limitations imposed by the Bankruptcy Code and the Bankruptcy Case:

(a) Organization and Authority. Each Seller is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Texas. Subject to

the entry of the Sale Order, each Seller has all requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.

(b) Authorization; Binding Effect. Subject to the entry of the Sale Order, the execution, delivery, and performance of this Agreement by the Sellers has been duly authorized by all necessary actions on the part of the Sellers. Subject to the entry of the Sale Order, this Agreement constitutes a legal, valid, and binding obligation of the Sellers, enforceable against the Sellers in accordance with its terms.

(c) Title. The Sellers own or otherwise have the right to transfer their right, title, and interest in the Purchased Assets. At the Closing, pursuant to the Sale Order, the Sellers shall convey to the Buyer all of the Sellers' right, title, and interest in the Purchased Assets, free and clear of all Liens, claims, interests, and encumbrances, other than Assumed Liabilities.

(d) No Conflicts. Subject to entry of the Sale Order, the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby do not (i) violate any provision of the Sellers' organizational documents or (ii) violate in any material respect any applicable law, rule, or regulation.

(e) Litigation. To the Knowledge of the Sellers, there is no pending or threatened action, suit, or proceeding before any Governmental Authority that would reasonably be expected to materially and adversely affect the Purchased Assets or the Sellers' ability to consummate the transactions contemplated hereby, other than the Bankruptcy Case.

(f) Material Contracts. Schedule 2.1(e) sets forth a true, correct, and complete list of all material contracts to which any Seller is a party that relate to the Business or the Purchased Assets (other than the Verizon Agreement, which is separately addressed). To the Knowledge of the Sellers, each such contract is in full force and effect, and no Seller is in material default under any such contract, and no event has occurred that, with notice or lapse of time or both, would constitute a material default thereunder.

(g) Verizon Agreement. The Verizon Agreement is an executory contract as that phrased is used in 11 U.S.C. § 365(a). To the Knowledge of the Sellers, except as set forth on Schedule 3.1(g), no Seller is in material default under the Verizon Agreement, and no event has occurred, after the Petition Date that, with notice or lapse of time or both, would constitute a material default thereunder. The Sellers have made available to the Buyer true, correct, and complete copies of the Verizon Agreement and all amendments, supplements, and modifications thereto.

(h) Intellectual Property. The Sellers own or have the right to use all intellectual property included in the Purchased Assets. To the Knowledge of the Sellers, (i) the operation of the Business as currently conducted does not infringe, misappropriate, or otherwise violate the intellectual property rights of any third party, and (ii) no third party is infringing, misappropriating, or otherwise violating the intellectual property included in the Purchased Assets.

(i) Compliance with Laws. To the Knowledge of the Sellers, except as set forth on Schedule 3.1(i), the Business has been conducted in compliance with all applicable laws, rules, and regulations in all material respects since the Petition Date. To the Knowledge of the Sellers, except as set forth on Schedule 3.1(i), no Seller has received written notice of any material violation of applicable law with respect to the Business or the Purchased Assets since the Petition Date.

(j) Privacy and Data Security. To the Knowledge of the Sellers, the Sellers have complied in all material respects with all applicable laws, regulations, and contractual obligations relating to the collection, use, storage, processing, transfer, and protection of personal information and subscriber data in connection with the Business. To the Knowledge of the Sellers, since the Petition Date, there has been no unauthorized access to, or breach of, any information technology systems of the Business that resulted in the unauthorized disclosure of personally identifiable information of customers or subscribers.

(k) Subscriber Records. To the Knowledge of the Sellers, the subscriber count and related data reflected in the Chargebee subscription ledger and Verizon line-level billing records are accurate in all material respects as of the date hereof. Schedule 3.1(l) sets forth a true, correct, and complete description of the methodology used to determine the Active Paying Subscriber count. To the Knowledge of the Sellers, except as set forth on Schedule 3.1(l), there has been no material change in churn rates or subscriber trends since the Petition Date that has not been disclosed to the Buyer.

(l) Modem/CPE Fleet. Schedule 3.1(m) sets forth a true, correct, and complete list of the deployed and warehoused modem and CPE inventory as of the date hereof, including the location, count, and condition of such devices. The Sellers own (and do not merely lease) such devices, and, to the Knowledge of the Sellers, the deployed units are recoverable by the Buyer post-Closing in accordance with applicable customer agreements.

(m) No Broker. Other than General Capital Partners, LLC, no broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission from the Sellers in connection with the transactions contemplated by this Agreement for which the Buyer would have any liability.

**THE SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE PURCHASED ASSETS OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS SECTION 3.1. WITHOUT LIMITING THE FOREGOING, THE SELLERS EXPRESSLY DISCLAIM ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR SUITABILITY, OR ANY WARRANTY ARISING FROM COURSE OF DEALING OR USAGE OF TRADE.**

**Section 4.2 Representations and Warranties of the Buyer.** The Buyer represents and warrants to the Sellers as follows:

(a) Organization and Authority. The Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of Washington. The Buyer has all requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.

(b) Authorization; Binding Effect. The execution, delivery, and performance of this Agreement by the Buyer has been duly authorized by all necessary action on the part of the Buyer. This Agreement constitutes a legal, valid, and binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms.

(c) Financial Capability. The Buyer has, or will have at the Closing, sufficient funds available to pay the Purchase Price and all other amounts payable by the Buyer hereunder and to

consummate the transactions contemplated by this Agreement. The Buyer's obligations hereunder are not subject to any financing condition.

(d) No Broker. No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission from the Buyer in connection with the transactions contemplated by this Agreement for which the Sellers would have any liability.

(e) Adequate Investigation. The Buyer is a sophisticated purchaser and has conducted, or will conduct prior to Closing, such independent inspections, investigations, and analyses of the Purchased Assets as the Buyer has deemed necessary or appropriate. The Buyer acknowledges and agrees that, except for the representations and warranties expressly set forth in Section 3.1, the Buyer is relying solely upon its own inspections, investigations, and analyses with respect to the Purchased Assets.

(f) No Conflicts. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby do not (i) violate any provision of the Buyer's organizational documents or (ii) violate in any material respect any applicable law, rule, or regulation.

(g) No Collusion. Neither the Buyer nor any of its affiliates or representatives has engaged in any collusion with respect to the bidding process or sale of any of the Purchased Assets, and the Buyer's bid is a good-faith, bona fide offer that the Buyer intends to consummate if selected as the Successful Bidder.

(h) Adequate Assurance. The Buyer is and will be capable of providing adequate assurance of future performance sufficient to satisfy the requirements of Section 365 of the Bankruptcy Code with respect to the Assumed Contracts.

## ARTICLE V
## AS-IS SALE; DUE DILIGENCE

**Section 5.1 As-Is, Where-Is Sale. BUYER ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF THE SELLERS EXPRESSLY SET FORTH IN SECTION 3.1, THE PURCHASED ASSETS AND THE WIRELESS CONNECTIVITY BUSINESS ARE BEING SOLD "AS IS, WHERE IS, AND WITH ALL FAULTS," AND THE SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, WITH RESPECT TO THE PHYSICAL CONDITION, VALUE, OR QUALITY OF THE PURCHASED ASSETS. WITHOUT LIMITING THE FOREGOING, THE SELLERS EXPRESSLY DISCLAIM ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR SUITABILITY, OR ANY WARRANTY ARISING FROM COURSE OF DEALING OR USAGE OF TRADE. NOTHING IN THIS SECTION 4.1 SHALL LIMIT OR MODIFY (A) THE REPRESENTATIONS AND WARRANTIES OF THE SELLERS EXPRESSLY SET FORTH IN SECTION 3.1, (B) THE BUYER'S RIGHTS AND REMEDIES WITH RESPECT TO ANY BREACH OF SUCH REPRESENTATIONS AND WARRANTIES, (C) THE SELLERS' OBLIGATIONS WITH RESPECT TO EXCLUDED LIABILITIES, OR (D) ANY CLAIM FOR FRAUD OR INTENTIONAL MISREPRESENTATION.**

**Section 5.2 Waiver and Release.** Effective upon the Closing, the Buyer, on behalf of itself and its successors and assigns, hereby waives and releases the Sellers, their members, officers, directors, employees, agents, and representatives, and their respective successors and assigns, from any and all claims,

demands, causes of action, losses, damages, liabilities, costs, and expenses (including attorneys' fees) of any kind or nature whatsoever, whether known or unknown, which the Buyer may have against the Sellers arising from or related to the physical condition of the Purchased Assets or matters that would be covered by any implied warranty disclaimed in Section 4.1; *provided*, *however*, that this waiver and release shall not apply to (a) claims for breach of the representations and warranties expressly set forth in Section 3.1, (b) claims for breach of any covenant or agreement of the Sellers under this Agreement, (c) claims with respect to Excluded Liabilities, (d) claims arising from the Sellers' fraud, intentional misrepresentation, or willful misconduct, or (e) any rights or remedies expressly provided to the Buyer under this Agreement or the Sale Order. The Buyer expressly waives and relinquishes any rights it may have under any statute or common law principle that would otherwise limit the effect of this release to claims known or suspected to exist at the time of execution of this Agreement, but only with respect to claims subject to this release.

**Section 5.3** **Access.** During the Due Diligence Period, the Sellers shall afford the Buyer and its representatives reasonable access during normal business hours, upon reasonable prior notice, to relevant books, records, files, contracts, customer and operational information, and other documents and information in the Sellers' possession or control relating to the Purchased Assets and the wireless connectivity business, including access to the data room and reasonable access to the Sellers' personnel with knowledge of such matters; provided that (a) such access shall not unreasonably interfere with the operations or activities of the Sellers, (b) the Buyer shall comply with applicable law and the Sellers' reasonable security and confidentiality procedures, and (c) the Buyer shall not contact customers, vendors, employees, or counterparties without the Sellers' prior written consent.

**Section 5.4** **Confidentiality.** The Buyer acknowledges that information provided by the Sellers in connection with the transactions contemplated hereby is confidential. The Buyer agrees to maintain such information in confidence and not to disclose it to any third party (other than the Buyer's advisors, lenders, and investors on a need-to-know basis) without the prior written consent of the Sellers, except as required by applicable law or court order.

**Section 5.5** **Risk of Loss**. From the date of this Agreement until the Closing, all risk of loss or damage to the Purchased Assets shall be borne by the Sellers. If, prior to the Closing, all or any material portion of the Purchased Assets is damaged, destroyed, or lost (including any material loss of subscribers, termination or material modification of the Verizon Agreement, or material disruption to the operating platform), the Sellers shall promptly notify the Buyer in writing thereof. In such event, the Buyer may, in its sole discretion, (a) proceed with the Closing, in which case the Buyer shall be entitled to any insurance proceeds payable with respect to such loss or damage to the extent relating to the Purchased Assets, and the Purchase Price shall be reduced by the amount of any uninsured loss, or (b) if such loss, damage, or destruction constitutes a Material Adverse Change, terminate this Agreement pursuant to Section 7.2, in which case the Good Faith Deposit shall be returned to the Buyer in accordance with Section 3.1(b).

**Section 5.6** **Schedule Updates**. During the Due Diligence Period, the Sellers shall cooperate in good faith with the Buyer to identify and correct any errors, omissions, or inaccuracies in the Schedules to this Agreement.

## ARTICLE VI
## BANKRUPTCY COURT APPROVAL

**Section 6.1** **Sale Motion.** Within one (1) Business Day following execution of this Agreement, the Sellers shall file a "Notice of Stalking Horse" in the Bankruptcy Case designating the Buyer as the Stalking Horse (as defined in the Bid Procedures Order). The Sellers shall use commercially reasonable efforts to obtain entry of the Sale Order on or before November 10, 2026.

**Section 6.2** **Sale Order**. The obligation of the Parties to consummate the transactions contemplated by this Agreement is conditioned upon entry of the Sale Order by the Bankruptcy Court. The Sale Order shall, among other things:

(a) authorize the sale of the Purchased Assets to the Buyer free and clear of all Liens, claims, interests, and encumbrances (other than Assumed Liabilities) pursuant to Sections 1123(a)(5), 1123(b)(4), 1141(c), and 1142(b) of the Bankruptcy Code;

(b) provide that the Sale Order is not subject to any stay;

(c) find that the Buyer is a good faith purchaser entitled to all protections available under applicable law, including protections analogous to those afforded by Section 363(m) of the Bankruptcy Code, to the fullest extent permitted by law;

(d) find that adequate and reasonable notice of the sale was provided to all interested parties in accordance with applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure;

(e) find that the consideration provided by the Buyer for the Purchased Assets constitutes reasonably equivalent value and fair consideration;

(f) provide that all Persons are permanently enjoined from asserting against the Buyer, its successors, or the Purchased Assets any claims, interests, or encumbrances that arose prior to the Closing (other than Assumed Liabilities);

(g) find that the assumption and assignment to the Buyer of the Assumed Contracts is authorized under Section 365 of the Bankruptcy Code, that the Buyer has provided adequate assurance of future performance;

(h) provide that the Sale Order shall be binding upon and inure to the benefit of the Sellers, their estates, all holders of Liens, claims, interests, and encumbrances, the Buyer, and their respective successors and assigns; and

(i) find that the Buyer is not a successor to the Sellers or their estates, by reason of any theory of law or equity, for any liability of the Sellers, including any liability for Taxes and any liability under any bulk-sales, bulk-transfer or successor-liability law. The Sale Order shall also include a finding that notice of the Sale Motion was properly provided to all Governmental Authorities with Tax jurisdiction over the Sellers or the Business, and that the Sale Order is binding on all such Governmental Authorities.

**Section 6.3** **Backup Bidder.** The Buyer acknowledges that pursuant to the Bidding Procedures Order, the Sellers may designate a backup bidder (the "Backup Bidder") in connection with the auction process. In the event the Buyer is designated as the Backup Bidder, the Buyer agrees to remain obligated to consummate the transactions contemplated by this Agreement on the terms set forth herein until the earlier of (a) the closing of a sale of the Purchased Assets to another party and (b) the Outside Date.

**Section 6.4** **Cooperation.** Each Party shall cooperate with the other and shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper, or advisable to obtain the Sale Order and to consummate the transactions contemplated hereby as promptly as practicable.

**Section 6.5** **Competing Transactions.** Each Party acknowledges that this Agreement and the sale of the Purchased Assets and the assumption and assignment of the Assumed Contracts are subject to approval by the Bankruptcy Court. The Parties further acknowledge that the Sellers are debtors and debtors-in-possession in the Bankruptcy Case and, in that capacity, are subject to fiduciary obligations to their bankruptcy estates and creditors. Accordingly, nothing in this Agreement shall restrict, or be construed to restrict, the Sellers' right, consistent with their fiduciary obligations and upon the written advice of counsel, to (a) consider, respond to, and negotiate the terms of any unsolicited inquiry, proposal, or offer relating to a competing transaction and (b) accept, seek approval of, and consummate a competing transaction if approved by the Bankruptcy Court.

**Section 6.6** **No Successor Liability.** Except as expressly provided in this Agreement, the Buyer shall not be deemed, as a result of any action taken in connection with this Agreement or the transactions contemplated hereby or any document or agreement executed in connection herewith, to (a) be a legal successor, or otherwise be deemed a successor to, the Sellers, (b) have, de facto or otherwise, merged with or into the Sellers, or (c) be a continuation or substantial continuation of the Sellers or any enterprise of the Sellers. Except as expressly provided in this Agreement, nothing in this Agreement or the Closing shall be deemed to constitute an assumption by the Buyer, directly or indirectly, of the Excluded Liabilities.

**Section 6.7** **Non-Assignment of Assets.** Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer, and shall not effect the assignment or transfer of, any Purchased Asset if (a) such assignment or transfer is prohibited by applicable law, (b) such assignment or transfer would require a consent, approval, authorization, or waiver of any third party or Governmental Authority that has not been obtained, or (c) the Bankruptcy Court has not entered an order approving such assignment or transfer. In such event, the Sellers and the Buyer shall use their respective commercially reasonable efforts to obtain any necessary consents, approvals, authorizations, or waivers and shall cooperate with each other in good faith to obtain the same; provided, however, that neither Party shall be obligated to pay any consideration therefor or initiate any litigation or legal proceeding to obtain any such consent, approval, authorization, or waiver without its prior written consent. If any such consent, approval, authorization, or waiver is not obtained, the Sellers and the Buyer shall use commercially reasonable efforts to implement an arrangement reasonably acceptable to both Parties that provides the Buyer with the benefits and imposes on the Buyer the obligations associated with such Purchased Asset, to the extent permitted by applicable law, and shall complete the assignment or transfer as soon as reasonably practicable after such consent, approval, authorization, or waiver is obtained.

**Section 6.8** **Publicity.** Prior to the Closing or earlier termination of this Agreement, neither Party will issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without the prior written approval of the other Party, except as required by applicable law, the Bankruptcy Court, or in ordinary or required pleadings filed in the Bankruptcy Case. To the extent practicable and legally permissible, the Parties shall use commercially reasonable efforts to consult with each other regarding the text of any such required disclosure.

## ARTICLE VII
## CLOSING

**Section 7.1** **Closing.** The closing of the transactions contemplated by this Agreement (the "Closing") shall take place on the date that is on or prior to five (5) Business Days after entry of the Sale Order, but in no event later than November 16, 2026 (or such earlier date as the Sale Order may direct), or such other date as the Parties may mutually agree in writing (the "Closing Date"), remotely by electronic exchange of documents and wire transfer, or at the offices of Reed Smith, LLP, 2850 N. Harwood St., Suite 1500, Dallas, TX 75201, or at such other place or by such other means as the Parties may mutually agree.

**Section 7.2 Sellers' Closing Deliveries.** At the Closing, the Sellers shall deliver or cause to be delivered to the Buyer the following:

(a) a bill of sale duly executed by the Sellers, transferring the tangible personal property included in the Purchased Assets;

(b) to the extent not excused by section 365(f) of the Bankruptcy Code, one or more assignment and assumption agreements duly executed by the Sellers, assigning to the Buyer the Assumed Contracts and other assignable intangible Purchased Assets;

(c) to the extent not excused by section 365(f) of the Bankruptcy Code, such certificates, instruments, and other documents as may be reasonably necessary to effect the transfer of any permits, licenses, approvals, authorizations, and other Purchased Assets, to the extent transferable;

(d) a duly completed and executed IRS Form W-9 with respect to each Seller;

(e) evidence, in form and substance reasonably satisfactory to the Buyer, of Cellco Partnership d/b/a Verizon Wireless's written consent to the assumption and assignment of the Verizon Agreement to the Buyer;

(f) one or more intellectual property assignment agreements, duly executed by the Sellers, assigning to the Buyer all intellectual property included in the Purchased Assets, including the "Nomad Internet" trade name, domain names, websites, software, and technology;

(g) the Transition Services Agreement, duly executed by Sellers; and

(h) such other documents as may be reasonably necessary or appropriate to consummate the transactions contemplated hereby.

**Section 7.3 The Buyer's Closing Deliveries.** At the Closing, the Buyer shall deliver or cause to be delivered to the Sellers the following:

(a) the Purchase Price, less the Good Faith Deposit, by wire transfer of immediately available funds;

(b) a certificate of the Buyer certifying that the representations and warranties set forth in Section 3.2 are true and correct in all material respects as of the Closing Date;

(c) one or more assignment and assumption agreements, duly executed by the Buyer, evidencing the Buyer's assumption of the Assumed Liabilities and the Assumed Contracts; and

(d) such other documents as may be reasonably necessary or appropriate to consummate the transactions contemplated hereby.

**Section 7.4 Transfer Taxes.**

(a) To the maximum extent provided by Section 1146(a) of the Bankruptcy Code, any sale, transfer, or conveyance of the Purchased Assets or any instrument executed in connection therewith, including any bills of sale, assignments, or other instruments of transfer, shall not be

subject to any transfer tax, recording fee, stamp tax, conveyance fee, or similar tax or governmental assessment.

**Section 7.5** **Prorations**. All prepaid expenses, deposits, utility charges, and other similar items relating to the Purchased Assets and the Business shall be prorated between the Sellers and the Buyer as of 11:59 p.m. (Central time) on the day immediately preceding the Closing Date, with the Sellers responsible for the portion attributable to the period prior to the Closing Date and the Buyer responsible for the portion attributable to the period from and after the Closing Date. Any amounts owed by one Party to the other pursuant to this Section shall be settled within thirty (30) days after the Closing Date. The Parties shall cooperate in good faith to calculate the prorations contemplated hereby.

**CONDITIONS TO CLOSING**

**Section 7.6** **Conditions to the Buyer's Obligations.** The obligation of the Buyer to consummate the Closing is subject to the satisfaction (or written waiver by the Buyer) of the following conditions:

(a) the representations and warranties of the Sellers set forth in Section 3.1 shall be true and correct in all material respects as of the Closing Date (except that representations qualified by materiality shall be true and correct in all respects);

(b) the Sellers shall have performed and complied in all material respects with all covenants and obligations required to be performed by the Sellers under this Agreement on or before the Closing Date;

(c) the Sale Order shall have been entered by the Bankruptcy Court and shall not have been stayed, reversed, modified, or amended in any material respect;

(d) the Sellers shall have delivered or transferred or caused to be delivered or transferred to the Buyer's possession each of the items set forth in Section 6.2; and

(e) the Buyer shall have received written confirmation from Verizon, in form and substance reasonably satisfactory to the Buyer, of the line count, rate plans, and Company IDs under which the subscriber base is billed, and that such lines, plans, and Company IDs are subject to the Verizon Agreement and Project Attachment No. 1 rather than any superseding attachment;

(f) the Buyer shall have received confirmation, in form and substance reasonably satisfactory to the Buyer, of the location, count, condition, and ownership of the deployed and warehoused modem fleet;

(g) the Buyer shall have received evidence, in form and substance reasonably satisfactory to the Buyer, that the material SaaS and payment-processing agreements have been assigned or replaced and that the merchant-of-record and payment vault have transferred to the Buyer without disruption to recurring billing;

(h) since the date of this Agreement, no Material Adverse Change shall have occurred, and no event, change, effect, or occurrence shall have occurred that would reasonably be expected to result in a Material Adverse Change;

(i) prior to or concurrently with the Closing, the Buyer (or its designee) and Cellco Partnership d/b/a Verizon Wireless shall have entered into the Amended Verizon Agreement, which

agreement shall be fully executed and in full force and effect (or effective upon or immediately following the Closing), and shall not contain any term, condition, or restriction that would reasonably be expected to materially impair the Buyer's ability to operate the Business substantially as conducted prior to the Closing. The satisfaction of this condition shall be determined by the Buyer in its reasonable discretion and this condition is solely for the benefit of the Buyer and may not be waived by the Sellers; and

(j) the Sellers and the Buyer shall have executed and delivered the Transition Services Agreement.

**Section 7.7** **Conditions to the Sellers' Obligations.** The obligation of the Sellers to consummate the Closing is subject to the satisfaction (or written waiver by the Sellers) of the following conditions:

(a) the representations and warranties of the Buyer set forth in Section 3.2 shall be true and correct in all material respects as of the Closing Date;

(b) the Buyer shall have performed and complied in all material respects with all covenants and obligations required to be performed by the Buyer under this Agreement on or before the Closing Date;

(c) the Sale Order shall have been entered by the Bankruptcy Court and shall not have been stayed, reversed, modified, or amended in any material respect; and

(d) the Buyer shall have delivered or caused to be delivered to the Sellers each of the items set forth in Section 6.3.

**Section 7.8** **No Frustration of Closing Conditions.** Neither the Buyer nor the Sellers may rely on the failure of any condition to its respective obligations to consummate the transactions contemplated hereby set forth in Section 6.6 or Section 6.7, as the case may be, to be satisfied if such failure was caused by such Party's failure to use commercially reasonable efforts (or such other applicable efforts standard expressly contemplated hereby) to satisfy such condition.

## ARTICLE VIII
## INTERIM COVENANTS

**Section 8.1** **Conduct of Business Pending Closing.** From the date of this Agreement until the earlier of the Closing Date or the termination of this Agreement, the Sellers shall, subject to any limitations imposed by the Bankruptcy Court or the Bankruptcy Code:

(a) use commercially reasonable efforts to operate and maintain the wireless connectivity business in the ordinary course, consistent with past practice, including maintaining the Purchased Assets, equipment, technology, and customer relationships in substantially their current condition, ordinary wear and tear excepted;

(b) not sell, transfer, or encumber any of the Purchased Assets outside the ordinary course of business without the prior written consent of the Buyer (not to be unreasonably withheld, conditioned, or delayed);

(c) promptly notify the Buyer in writing of (i) any Material Adverse Change or any material loss or impairment of any Purchased Asset, (ii) any material litigation, claim, or

proceeding commenced or threatened against any Seller relating to the Business or the Purchased Assets, (iii) any material default or event of default under any Assigned Contract, and (iv) any loss of any material customer or group of customers;

(d) use commercially reasonable efforts to maintain in full force and effect all material permits, approvals, and authorizations relating to the Purchased Assets;

(e) use commercially reasonable efforts to maintain the Verizon Agreement in good standing and preserve it in full force and effect, including by (i) cooperating in good faith with the Buyer in connection with the negotiation of the Amended Verizon Agreement, (ii) providing the Buyer and its representatives with reasonable access to the Sellers' personnel, books, records, and information relating to the Verizon Agreement and the relationship with Verizon, (iii) facilitating introductions and communications between the Buyer and Verizon and participating in meetings and discussions with Verizon as reasonably requested by the Buyer, and (iv) not taking any action, or failing to take any action, that would reasonably be expected to impair, delay, or prevent the negotiation, execution, or effectiveness of the Amended Verizon Agreement or that would result in termination, suspension, or material modification of the Verizon Agreement without the Buyer's prior written consent;

(f) negotiate in good faith with the Buyer the terms of the Transition Services Agreement and use commercially reasonable efforts to identify and make available those employees and contractors of the Sellers who are material to the continued operation of the Business during the transition period;

(g) not enter into, amend, modify, terminate, or waive any material right under any Assigned Contract without the prior written consent of the Buyer (not to be unreasonably withheld, conditioned, or delayed); and

(h) not hire any new employees or independent contractors or increase the compensation of any existing employees or independent contractors of the Business, in each case outside of the ordinary course of business, without the prior written consent of the Buyer.

## ARTICLE IX
## TERMINATION

**Section 9.1** **Termination.** This Agreement may be terminated at any time prior to the Closing:

(a) by mutual written consent of the Sellers and the Buyer;

(b) by either Party, upon written notice to the other Party, if the Closing shall not have occurred on or before the date that is forty-five days following the date hereof (the "Outside Date"), provided that the terminating Party is not then in material breach of any of its obligations hereunder;

(c) by either Party, upon written notice to the other Party, if any court of competent jurisdiction or other Governmental Authority shall have issued a final, non-appealable order prohibiting the consummation of the transactions contemplated hereby;

(d) by the Buyer, upon written notice to the Sellers, if the Bankruptcy Court shall have entered an order approving the sale of the Purchased Assets to a party other than the Buyer (and the Buyer is not the Backup Bidder obligated to remain under Section 5.3);

(e) by the Buyer, upon written notice to the Sellers, if the Sellers shall have materially breached any of its representations, warranties, covenants, or obligations under this Agreement, and such breach shall not have been cured within ten (10) Business Days following the Sellers' receipt of written notice thereof from the Buyer (provided that the Buyer is not then in material breach of its obligations hereunder);

(f) by the Sellers, upon written notice to the Buyer, if the Buyer shall have materially breached any of its representations, warranties, covenants, or obligations under this Agreement, and such breach shall not have been cured within five (5) Business Days following the Buyer's receipt of written notice thereof from the Sellers;

(g) by either Party, upon written notice to the other Party, if the Bankruptcy Case is converted to a case under chapter 7 of the Bankruptcy Code or dismissed, but only if such conversion or dismissal would materially impair or delay Closing; or

(h) by either Party, upon written notice to the other Party, if (i) any of the conditions to such Party's obligations to consummate the Closing set forth in Section 6.6 (in the case of the Buyer) or Section 6.7 (in the case of the Sellers) have not been satisfied or waived by the Outside Date, or (ii) the other Party has failed to satisfy any condition to the terminating Party's obligations to consummate the Closing set forth in Section 6.6 or Section 6.7, as applicable, and such failure is not cured within ten (10) Business Days following written notice thereof; provided that the terminating Party is not then in material breach of its obligations under this Agreement that has caused or contributed to the failure of such condition.

For purposes of this Section 7.2, references to "either Party" shall refer to the Buyer, on the one hand, and the Sellers, on the other hand.

**Section 9.2 Effect of Termination.** In the event of termination of this Agreement pursuant to Section 7.2, this Agreement shall be of no further force or effect, except that (a) the provisions of this Section 7.3, Section 3.1(b) Section 7.5, and ARTICLE IX shall survive termination, and (b) nothing herein shall relieve any Party from liability for fraud or any willful or intentional breach of this Agreement prior to such termination.

**Section 9.3 Break-Up Fee and Expense Reimbursement.** In consideration of the Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof, if this Agreement is terminated as a result of the Sellers' consummation of a competing transaction, the Buyer shall be entitled to (a) an expense reimbursement amount not to exceed $60,000.00 (the "Expense Reimbursement Amount") and (b) an amount equal to 3% of the Purchase Price (the "Break-Up Fee"). No Person other than the Buyer shall be entitled to a Break-Up Fee or Expense Reimbursement Amount. For the avoidance of doubt, the Break-Up Fee and Expense Reimbursement Amount shall constitute administrative expense claims against the Sellers' estates and shall be payable to the Buyer from the proceeds of the competing transaction upon the closing thereof.

## ARTICLE X
## ACKNOWLEDGMENT OF 363 SALE STRUCTURE; BUYER INDEMNIFICATION

**Section 10.1 Acknowledgment of 363 Sale Protections.** The Buyer acknowledges and agrees that (a) this transaction is a sale conducted pursuant to Section 363 of the Bankruptcy Code and is subject to the approval of the Bankruptcy Court, (b) the Purchased Assets are being sold on an "as is, where is" basis as more fully set forth in Section 4.1, (c) the Buyer's primary protections arise from the Sale Order and Section 363(f) of the Bankruptcy Code, rather than from contractual indemnification by the Sellers, (d)

the purchase price reflects the absence of formal seller indemnification, and (e) except as expressly provided in Section 8.3 with respect to Excluded Liabilities and Section 8.4 with respect to fraud or willful misconduct, the Buyer shall have no right to seek indemnification from the Sellers or the Sellers' estates for any Losses arising out of or relating to the Purchased Assets, the Assumed Liabilities, or the transactions contemplated hereby. The Buyer's sole recourse with respect to matters relating to the Purchased Assets or the Business (other than Excluded Liabilities or claims for fraud or willful misconduct) shall be limited to the protections afforded by the Sale Order and Section 363(f) of the Bankruptcy Code.

**Section 10.2** **Indemnification by the Buyer.** The Buyer shall indemnify, defend, and hold harmless the Sellers and their officers, directors, members, managers, employees, agents, successors, and assigns (each, a "Seller Indemnified Party") from and against any and all losses, liabilities, damages, claims, costs, and expenses (including reasonable attorneys' fees and expenses) ("Losses") incurred or suffered by any Seller Indemnified Party arising out of or resulting from (a) any Assumed Liability, (b) the operation of the Business or the ownership of the Purchased Assets from and after the Closing, or (c) any breach of any covenant or agreement of the Buyer to be performed after the Closing pursuant to this Agreement.

**Section 10.3** **Excluded Liabilities.** Notwithstanding anything to the contrary in Section 8.1, the Sellers shall remain responsible for all Excluded Liabilities. The Buyer shall not assume and shall have no liability or obligation with respect to any Excluded Liability, and to the extent any Excluded Liability is asserted against the Buyer, the Buyer shall be entitled to assert such Excluded Liability as a claim against the applicable Seller's estate in accordance with the Bankruptcy Code and applicable law.

**Section 10.4** **Fraud and Willful Misconduct.** Notwithstanding anything to the contrary in this Article or in Section 4.1, nothing in this Agreement shall limit or waive the Buyer's right to assert claims against the Sellers or the Sellers' estates based on fraud or willful misconduct. Any such claims shall be asserted in accordance with the Bankruptcy Code and applicable law.

**Section 10.5** **Indemnification Procedures.** Any Seller Indemnified Party seeking indemnification under Section 8.2 shall promptly notify the Buyer in writing of any claim, demand, action, or proceeding for which indemnification is sought (a "Claim Notice"); provided that the failure to provide prompt notice shall not relieve the Buyer of its obligations hereunder except to the extent that the Buyer is materially prejudiced thereby. The Buyer shall have the right, at its sole cost and expense, to assume the defense of any third-party claim, provided that (i) the Buyer gives written notice to the Seller Indemnified Party of its intent to assume the defense within fifteen (15) days after receipt of the Claim Notice, (ii) the Buyer conducts the defense diligently and in good faith, and (iii) the Seller Indemnified Party shall have the right to participate in (but not control) such defense at its own expense. The Buyer shall not settle any third-party claim without the prior written consent of the Seller Indemnified Party (not to be unreasonably withheld, conditioned, or delayed), unless such settlement includes an unconditional release of the Seller Indemnified Party from all liabilities arising out of such claim.

**Section 10.6** **Exclusive Remedy; Sale Order Protections.** Except for claims based on fraud or willful misconduct and except for claims for specific performance or other equitable relief as expressly provided in this Agreement, the Buyer's sole and exclusive remedies against the Sellers following the Closing shall be (a) the protections afforded by the Sale Order and Section 363(f) of the Bankruptcy Code, (b) the assertion of claims with respect to Excluded Liabilities against the Sellers' estates in accordance with the Bankruptcy Code and applicable law, and (c) the indemnification by the Buyer in Section 8.2 (to the extent applicable to Seller Indemnified Parties). Nothing in this Article shall limit the Buyer's rights under the Sale Order or applicable provisions of the Bankruptcy Code.

## ARTICLE XI
## MISCELLANEOUS

**Section 11.1 Survival**. The representations, warranties, covenants, and agreements contained in this Agreement shall not survive the Closing, except for those covenants and agreements that by their express terms are to be performed after the Closing Date, which shall survive the Closing until fully performed, and except for Section 4.4 (Confidentiality), ARTICLE VIII (Acknowledgment of 363 Sale Structure; Buyer Indemnification), Section 9.12 (Cooperation on Tax Matters), and Section 9.13 (Further Assurances), each of which shall survive the Closing in accordance with its terms, and except for Section 4.2 (Waiver and Release), Section 5.6 (No Successor Liability), Section 9.6 (Assignment), Section 9.7 (Governing Law), Section 9.8 (Jurisdiction), Section 9.11 (No Third-Party Beneficiaries), Section 9.14 (Specific Performance), Section 9.15 (Waiver of Jury Trial), Section 9.16 (Wrong Pocket), and Section 9.17 (No Recourse), each of which shall survive indefinitely.

**Section 11.2 Notices.** All notices, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) when delivered personally, (b) upon confirmation of receipt when transmitted by electronic mail (with confirmation of transmission, provided that a copy is concurrently sent by one of the other methods described herein), (c) upon receipt after dispatch by registered or certified mail, postage prepaid, return receipt requested, or (d) on the next Business Day if transmitted by national overnight courier, in each case addressed as follows:

| | |
|---|---|
| If to the Sellers: | GEV IO LLC d/b/a Nomad Internet<br>Attn: Erik White, Chief Restructuring Officer<br>8911 N. Capital of Tx Hwy., Ste. 2120<br>Austin, Texas 78759<br>E-mail: ewhite@harneypartners.com |
| With a copy (which shall not constitute notice) to: | Reed Smith LLP<br>Attn: Omar J. Alaniz; Taylre C. Janak<br>2850 N. Harwood Street, Suite 1500<br>Dallas, TX 75201<br>E-mail: oalaniz@reedsmith.com; tjanak@reedsmith.com |
| If to the Buyer: | Castel Network Partners LLC |
| With a copy (which shall not constitute notice) to: | Attn: John Okemah; Kyle Ismail<br>242 Broome Street 7C<br>New York, NY 10002<br>Email: john@castelnetworkpartners.com<br>kyle@castelnetworkpartners.com<br><br>Croke Fairchild Duarte & Beres LLC<br>Attention: Taryn Strohmeyer and Max Markoff<br>222 N. LaSalle St., Suite 500<br>Chicago, IL 60601<br>Email: tstrohmeyer@crokefairchild.com<br>mmarkoff@crokefairchild.com |

**Section 11.3 Entire Agreement.** This Agreement, together with the exhibits and schedules hereto, constitutes the entire agreement between the Parties with respect to the subject matter hereof and

supersedes all prior negotiations, representations, warranties, commitments, offers, and agreements (whether oral or written) with respect to the subject matter hereof.

**Section 11.4** **Amendment.** This Agreement may not be amended, supplemented, or modified except by a written instrument executed by both Parties. Any such amendment shall be subject to approval of the Bankruptcy Court to the extent required.

**Section 11.5** **Waiver.** No waiver of any provision of this Agreement shall be effective unless set forth in a written instrument signed by the Party waiving such provision. No failure or delay by a Party in exercising any right hereunder shall operate as a waiver thereof.

**Section 11.6** **Assignment.** Neither Party may assign this Agreement or any of its rights or obligations hereunder without the prior written consent of the other Party (not to be unreasonably withheld, conditioned, or delayed), except that the Buyer may assign its rights under this Agreement to an affiliate of the Buyer without the consent of the Sellers, provided that (i) no such assignment shall relieve the Buyer of its obligations hereunder, (ii) the Buyer shall remain jointly and severally liable with such assignee for all obligations hereunder, and (iii) such assignment shall not delay the Closing.

**Section 11.7** **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without regard to conflict of laws principles, and, to the extent applicable, the Bankruptcy Code.

**Section 11.8** **Jurisdiction.** The Bankruptcy Court shall have exclusive jurisdiction over any dispute arising out of or relating to this Agreement or the transactions contemplated hereby; provided, however, that if the Bankruptcy Case has been closed, the Parties consent to the exclusive jurisdiction of the state and federal courts located in Dallas County, Texas. Each Party irrevocably submits to the jurisdiction of the Bankruptcy Court and waives any objection to venue in the Bankruptcy Court.

**Section 11.9** **Counterparts; Electronic Signatures.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Delivery of an executed counterpart by electronic transmission (including PDF, DocuSign, or similar electronic signature platform) shall be as effective as delivery of an original executed counterpart.

**Section 11.10** **Severability.** If any provision of this Agreement is held to be invalid, illegal, or unenforceable, such provision shall be modified to the minimum extent necessary to make it valid, legal, and enforceable, and the validity, legality, and enforceability of the remaining provisions shall not be affected or impaired thereby.

**Section 11.11** **No Third-Party Beneficiaries.** This Agreement is for the sole benefit of the Parties and their permitted successors and assigns and nothing herein shall confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever.

**Section 11.12** **Cooperation on Tax Matters.** The Parties shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with any tax matter relating to the Purchased Assets or the Business, including (a) the preparation and filing of tax returns, (b) the determination of any tax liability or right to refund, and (c) any audit, examination, or proceeding with respect to taxes. Each Party shall retain all books and records relating to tax matters pertinent to the Purchased Assets and the Business relating to any taxable period beginning before the Closing Date until the expiration of the applicable statute of limitations.

**Section 11.13** **Further Assurances.** Each Party shall, at the request and reasonable expense of the requesting Party, execute and deliver such further instruments and take such further actions as may be reasonably necessary to effectuate the transactions contemplated by this Agreement.

**Section 11.14** **Specific Performance.** The Parties acknowledge that irreparable harm would occur if any of the provisions of this Agreement were not performed in accordance with their specific terms and that monetary damages would not be an adequate remedy. Accordingly, each Party shall be entitled to seek specific performance and injunctive or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which it is entitled at law or in equity. Each Party waives any requirement for the posting of any bond or security in connection with the granting of any such relief.

**Section 11.15** **Waiver of Jury Trial. EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

**Section 11.16** **Wrong Pocket.** If, at any time after the Closing, the Buyer or its designee holds any Excluded Assets or Excluded Liabilities, or the Sellers hold any Purchased Assets or Assumed Liabilities, the Party holding or possessing such assets or liabilities shall promptly transfer (or cause to be transferred) such assets, or assume (or cause to be assumed) such liabilities, to or from, as applicable, the other Party, without further consideration from the other Party. Prior to any such transfer, the Party receiving or possessing any such asset shall hold it in trust for the other Party.

**Section 11.17** **No Recourse.** Except as provided in Section 8.2 with respect to the Buyer's indemnification of Seller Indemnified Parties, no past, present, or future director, officer, employee, member, partner, manager, stockholder, affiliate, agent, attorney, or representative of either Party (in such capacity) shall have any personal liability for any claims, causes of action, obligations, or liabilities arising under, out of, in connection with, or related to this Agreement or the transactions contemplated hereby, except to the extent arising out of such person's fraud or willful misconduct. To the maximum extent permitted by applicable law, and subject to the foregoing exceptions, each Party hereby waives and releases all such claims, causes of action, obligations, and liabilities against each such person. For the avoidance of doubt, nothing in this Section shall limit the rights of any Seller Indemnified Party under Section 8.2.

**Section 11.18** For purposes of this Agreement: (i) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (ii) the word "or" is not exclusive; (iii) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole; (iv) words denoting the singular have a comparable meaning when used in the plural, and vice versa; (v) words denoting any gender include all genders; (vi) references to a Person include such Person's successors and permitted assigns; (vii) references to any law, statute, rule, or regulation shall be deemed to refer to such law, statute, rule, or regulation as amended, supplemented, or otherwise modified from time to time; (viii) references to "$" or "dollars" shall mean United States dollars; (ix) references to any agreement or instrument shall include all amendments, exhibits, schedules, and other attachments thereto; (x) the headings and captions used in this Agreement are for convenience of reference only and shall not affect the construction of this Agreement; and (xi) the Parties have participated jointly in the negotiation and drafting of this Agreement, and in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed as of the date first written above.

**SELLERS:**

**GEV IO LLC d/b/a Nomad Internet**, a Texas limited liability company

By: ______________________________
Name: Erik White
Title: Chief Restructuring Officer

**EVERYWHERE INTERNET, LLC**, a Texas limited liability company

By: ______________________________
Name: Erik White
Title: Chief Restructuring Officer

**BUYER:**

**CASTEL NETWORK PARTNERS, LLC,** a Washington limited liability company

By: ______________________________
Name: John Okemah
Title: Managing Partner

**Schedule 2.1(a)[3]**

[3] Note to draft: Seller to populate schedule.

**Schedule 2.1(d)**[4]

Intellectual Property

[4] Note to draft: Seller to populate schedule.

**Schedule 2.1(e)**[5]

Assigned Contracts

[5] Note to draft: Seller to populate schedule.

**Schedule 2.2**[6]

Excluded Assets

[6] Note to draft: Seller to populate schedule.

**Schedule 3.1(g)**

**Schedule 3.1(i)**

**Schedule 3.1(k)**

**Schedule 3.1(l)**

**Schedule 3.1(m)**